## UNITED STATES v. PATTEN et al.

(Circuit Court, S. D. New York. March 23, 1911.)

1. MONOPOLIES (§ 31*)—ANTI-TRUST ACT—VIOLATION—INDICTMENT—OVERT ACTS—"CONSPIRACY."

Congress, by federal Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), having employed the words "conspiracy" and "conspire" without words of limitation in creating offenses affecting interstate commerce, did not provide as in the general conspiracy statute (Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676]) that overt acts shall be necessary to complete the offense, and hence counts in an indictment for conspiracy to monopolize interstate trade and commerce in violation of the anti-trust law were not demurrable for failure to allege overt acts since the unlawful agreement, and not the overt acts, constitutes the crime of conspiracy at common law.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*

For other definitions, see Words and Phrases, vol. 2, pp. 1454-1461; vol. 8, p. 7613.]

2. INDICTMENT AND INFORMATION (§ 63*)—ALLEGATIONS—CONCLUSIONS "CALCULATED."

An allegation that a conspiracy is "calculated" to produce a certain result is an allegation of a mere conclusion, and ineffective.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 185; Dec. Dig. § 63.*

For other definitions, see Words and Phrases, vol. 1, pp. 942, 943.]

3. MONOPOLIES (§ 12*)—COMBINATIONS—"CORNER."

A "corner" is the securing of such control of the immediate supply of any product as to enable those operating the corner to arbitrarily advance the price of the product. It is ordinarily created by operations on boards of trade or stock exchanges, and by dealings in options and futures.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 2, p. 1600.]

4. MONOPOLIES (§ 12*)—CORNERS—PUBLIC POLICY.

While a corner is illegal because it is a combination which arbitrarily controls the prices of a commodity, it cannot be called a combination in restraint of competition since the going up of the price incident to the creation of a corner necessarily increases competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

5. MONOPOLIES (§ 31*)—RESTRAINT OF TRADE—RUNNING A CORNER—INTERSTATE COMMERCE.

Since the operation of a scheme to corner the cotton market and thereby raise the price of cotton for the purpose of compelling a settlement by short speculators at an abnormally high price does not directly affect or restrain interstate commerce, there being no direct relation between prices and such commerce, an indictment alleging a conspiracy to run a cotton corner without any alleged intent to obstruct interstate commerce did not charge a violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6.** MONOPOLIES (§ 12*)—INTERSTATE COMMERCE—OBSTRUCTION.

Any combination which interferes with the right of a manufacturer to purchase a commodity moving in interstate commerce, at prices determined by the competitive law of normal market conditions, does not necessarily constitute a direct restraint on interstate commerce in violation of the federal anti-trust act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

**7.** MONOPOLIES (§ 12*)—INTERSTATE COMMERCE—RESTRAINT—ANTI-TRUST ACT—"MONOPOLIZE."

Trade and commerce are monopolized, within Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1. 2. 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), prohibiting the same, when, as a result of efforts to that end, a few persons acting together obtain power to control the price of a commodity moving in interstate commerce, though such power is not exercised, its existence being sufficient.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

**8.** MONOPOLIES (§ 12*)—CONSPIRACY TO RESTRAIN COMMERCE—INDIVIDUAL ACTS.

An indictment against operators of a cotton corner for alleged violation of the Sherman anti-trust law charged that defendants had conspired to monopolize a part of the trade and commerce among the several states by becoming members of and engaging in an unlawful combination in the form of an agreement by which they were severally to purchase cotton to such an extent that, together, they would have enough to enable them to control the price of such cotton, and severally to demand arbitrary, excessive, and monopolistic prices for the same on the sale thereof by them respectively to spinners and manufacturers other than such conspirators. *Held* that, since no monopoly exists when individuals, each acting for himself, own large quantities of a commodity, the indictment was fatally defective as alleging only a scheme to demand monopolistic prices as the result of individual as distinguished from collective power.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

**9.** MONOPOLIES (§ 31*)—CONSPIRACY—INDICTMENT.

Since a conspiracy to monopolize is a conspiracy to create a monopoly, an indictment for conspiracy to monopolize interstate trade and commerce in cotton in violation of the Sherman anti-trust law, was insufficient where it failed to show that the conspiracy, if successfully carried out, would have resulted in a monopoly.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**10.** INDICTMENT AND INFORMATION (§ 125*)—DUPLICITY.

An indictment consisting of several counts was not duplicitous because of reference therein to other counts charging different offenses, only to give details of the offense charged in the counts objected to.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 334–400; Dec. Dig. § 125.*]

James A. Patten and others were indicted for alleged violation of the Sherman anti-trust law in the running of a corner in cotton. On demurrer to indictment. Sustained in part.

---

Spooner & Cotton, for defendants Brown, Hayne, and Scales.

George P. Merrick and Henry Wollman, for defendant Patten.

Henry A. Wise, U. S. Atty. (Felix Frankfurter, Clark McKercher, and Oliver E. Pagan, of counsel).

NOYES, Circuit Judge. This is an indictment in eight counts charging violations of sections 1 and 2 of the federal anti-trust statute. The first four counts charge conspiracies to monopolize interstate trade and commerce; the second and fourth containing no averments of overt acts. The fifth count charges a combination, and the sixth a contract in restraint of such trade and commerce. The seventh and eighth counts charge conspiracies by the method of "running a' corner"; the seventh count alone containing allegations of overt acts. The principal questions raised by the demurrers and motions, and with respect to which the sufficiency of different counts may be tested, are as follows: (1) Are the counts sufficient which contain no averments of overt acts? (2) Do the so-called "corner counts" charge a violation of the statute? (3) Does the third count—the "power" count—state a conspiracy to monopolize in violation of the statute? (4) Are the fifth and sixth counts invalid for duplicity?

[1] With respect to the first question, it is conceded that at common law the unlawful agreement constituted the crime of conspiracy and that it was unnecessary to allege or prove any act done in furtherance of it. In many of the states the rule of the common law has been changed by statute and the parties to the unlawful agreement are afforded a locus pœnitentiæ. They must do an act to effect the object of the agreement before the offense of conspiracy is complete. This change in the common law is not confined to state statutes. The general conspiracy statute of the United States (Rev. Stat. § 5440, U. S. Comp. St. 1901, p. 3676; also section 37, c. 321 of the Laws of 1909 [Act March 4, 1909, c. 321, § 37, 35 Stat. 1906, U. S. Comp. St. Supp. 1909, p. 1402]) provides that "if two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such parties do any act to effect the object of the conspiracy" each of the conspirators shall be punished.

But unless and until the common-law rule is changed by statute it is clear that when in either a state or a national enactment the offense of conspiracy, either general or specific, is created, the incidents of the offense at common law go with it. The term "conspiracy" has a well-defined common-law meaning. Congress in using it might attach limitations and qualifications, but if it fails to do so the common-law definition governs. That which completes the common-law offense completes the statutory offense. "Congress may as well define by using a term of a known and determinate meaning as by an express enumeration of all the particulars included in that term." United States v. Smith, 5 Wheat. 153, 159, 5 L. Ed. 57.

In the first and second sections of the federal anti-trust statute Congress employed, without words of limitation, the terms "conspiracy" and "conspire" in creating offenses affecting interstate commerce.

It did not provide, as in the general conspiracy statute, that overt acts should be necessary to complete the offenses. It used without qualification terms having well-known and determinate meanings, and qualifications cannot be added by construction. The anti-trust act is independent of the earlier conspiracy enactment, and the latter does not purport to be a statute of definition. While the offenses which it is directed against require overt acts, there is no warrant for reading its limitations into this separate, distinct and complete enactment. Consequently I reach the conclusion that the counts containing no averments of overt acts are not for that reason insufficient, and cannot but regard such conclusion as supported by the weight of authority. United States v. Kissel (C. C.) 173 Fed. 823; United States v. Patterson (C. C.) 55 Fed. 605. See, also, United States v. MacAndrews & Forbes Co. (C. C.) 149 Fed. 823; cf. United States v. Reichert (C. C.) 32 Fed. 142.

The second question is whether the so-called "corner counts"—the seventh and eighth—state acts constituting violations of the anti-trust statute. These counts are alike with the exception of the statement of overt acts, and each may be, broadly speaking, divided into three parts, which may be thus summarized:

(1) The charging part contains a general charge of conspiracy in restraint of interstate commerce, with the usual formal and jurisdictional averments.

(2) The second part contains a "description of the trade and commerce to be restrained." Under this head it is stated, in substance, that cotton is an article of necessity raised in the Southern states, which moves in large volume in interstate and foreign commerce, and that it is bought and sold upon the New York Cotton Exchange to such an extent as to practically regulate prices elsewhere in the country, so that future sales by speculators upon such exchange of more than the amount of cotton available at the time of delivery would create an abnormal demand and resultant excessive prices in all cotton markets.

(3) The third part contains a "description of the method devised and adopted by the conspirators for restraining the trade and commerce." It is alleged, at the outset, that the conspirators were to restrain trade and commerce by doing "what is commonly called running a corner in cotton." Averments then follow showing how the corner was to be brought about and its effect, which may be thus analyzed:

(1) The conspirators were to make purchases from speculators upon the New York Cotton Exchange of quantities of cotton for future delivery greatly in excess of the amount available for delivery when deliveries should become due.

(2) By these means an abnormal demand was to be created on the part of such sellers who would pay excessive prices to obtain cotton for delivery upon their contracts.

(3) The excessive prices prevailing upon the New York Exchange would cause similar prices to exist upon other cotton markets.

(4) "As a necessary and unavoidable result of their acts, said conspirators were to compel" cotton manufacturers throughout the country to pay said excessive prices to obtain cotton for their needs or else curtail their operations.

(5) And also, as "a necessary and unavoidable result" of said acts, an unlawful obstruction would be put upon interstate trade and commerce.

The offense charged, then, is a conspiracy in restraint of trade through the operation of a "corner," so that it is desirable, in the first place, to briefly examine the law governing that kind of combination.

It is also averred that the alleged unlawful conspiracy was "one calculated unlawfully to obstruct said interstate trade and commerce in such a manner as necessarily to cause the closing of some and the partial closing of many other cotton mills in the United States and elsewhere."

[2] An allegation that a conspiracy is one "calculated" to produce a certain result is not an allegation of fact. It must be treated as a conclusion drawn by the pleader, and, consequently, these allegations cannot be regarded as adding anything to the allegations analyzed in the text.

[3] The term "corner" is thus defined and described in Eddy on Combinations (vol. 1, §§ 72, 73):

"Broadly defined, a 'corner' is the securing of such control of the immediate supply of any product as to enable those operating the 'corner' to arbitrarily advance the price of the product. * * * Ordinarily a 'corner' is created by operations upon boards of trade or stock exchanges, and by dealings in 'options' and 'futures.'"

It is manifest, however, that securing control of the supply of a commodity with power to advance prices might afford the person operating a corner little or no profit unless an accompanying artificial demand could be created. This is effected, as is illustrated in the analysis of the corner in question, by purchases of futures from "short" sellers. Men who have nothing to deliver sell and agree to deliver upon a certain day that which they have to go into the market and buy. If the immediate supply is controlled they can only obtain what they require by bidding up prices, and, in the end, if the corner be successful, paying whatever its operators may dictate.

[4] Corners are illegal. They are combinations contrary to public policy, and all contracts and undertakings in support thereof are void. 1 Eddy on Combinations, § 81; Greenhood on Pub. Pol. p. 642, and cases cited in both treatises. But while a corner is illegal because it is a combination which arbitrarily controls the prices of a commodity, it cannot, strictly speaking, be called a combination in restraint of competition. On the contrary, the bidding up of the prices incident to the creation of a corner necessarily increases competition. Activity in trade, temporarily at least, follows increased demand. Everything tends to stimulate competition, although abnormally and feverishly. A corner is altogether wrong, both from a legal and an economical standpoint, but it would seem to be condemned by other principles

of public policy than those particularly relating to combinations in restraint of competition.

It is clear, upon the foregoing principles, that the combination described in these counts is negatively illegal without any prohibitory statute and would be positively unlawful in any state having a statute against corners. But upon equally well-settled principles it is manifest that the combination is not in violation of the federal anti-trust statute unless it obstructs the current of interstate commerce. Obviously this combination does not belong to that class of combinations in which the members are engaged in interstate commerce and enter into an agreement in restraint of competition. As just pointed out, it is more than doubtful whether a combination to run a corner restrains competition at all.[1] And if competition be affected, still none of these conspirators—so far as appears—does an interstate business. It is therefore unnecessary to examine the many cases cited from the Supreme Court and other federal tribunals where what may be termed "voluntary" restraints of trade have been created; i. e., where persons engaged in interstate trade have entered into combinations affecting it. The combination in question, if it be in violation of the statute, is so because it is an "involuntary" restraint of trade; i. e., it is a conspiracy entered into by persons not engaged in interstate commerce, which has the effect of preventing other persons from freely engaging in it.

The principal case relating to a conspiracy upon the part of outsiders to place obstructions in the way of the carrying on of interstate trade in violation of the anti-trust statute is Loewe v. Lawlor, 208 U. S. 274, 300, 28 Sup. Ct. 301, 309, 52 L. Ed. 488. That case was presented upon a demurrer to a complaint which averred "that there

---

[1] It is urged in the government's brief that it is immaterial that, from an economic standpoint, a corner may stimulate and not restrain trade. It is said that the determination whether a combination is a conspiracy in restraint of trade is not to be made from an economic point of view, but must be considered altogether from a legal standpoint, and the decision of the Circuit Court of Appeals for this circuit in Pennsylvania Sugar Refining Co. v. Am. Sugar Refining Co., 166 Fed. 254, 256, 92 C. C. A. 318, is quoted to the effect that a conspiracy may be in restraint of trade, although such a conspiracy "may actually develop and increase trade." But in that case the court was speaking of acts and agreements in restraint of competition and it was pointed out that, as the law regards competition as the life of trade, anything which restrains competition must, from the legal standpoint, necessarily restrain trade, although actual conditions of business might be such that the opposite result would be likely to follow. Thus a conspiracy upon the part of persons interested in one manufactory to obtain control of a competing company and put it out of business would be in restraint of trade, although it might be shown that with competition eliminated the volume of business would be increased. The decision referred to, however, affords no support for the proposition that when the conspiracy under consideration is one among outsiders, and is only unlawful because it places obstructions in the way of trade and commerce, it is immaterial that it may actually place no obstructions therein. In such a case there is no difference between the economical and the legal standpoint. Unless a conspiracy of such a nature actually affect the volume of trade, or the freedom with which it may be carried on, a restraint upon trade cannot be said to be imposed.

was an existing traffic between plaintiffs and citizens of other states, and that for the direct purpose of destroying such interstate traffic defendants combined" to prevent all interstate transportation of the goods manufactured by the plaintiff. The Supreme Court held that the complaint was sufficient and that the alleged combination was in direct restraint of interstate trade. Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 166 Fed. 254, 92 C. C. A. 318, already referred to, is a case somewhat different in its nature from Loewe v Lawlor. In that case it was averred that a conspiracy was formed in the interest of one manufacturing company to obtain control of a competing corporation for the purpose of preventing it from engaging in business, and it was held that "a conspiracy to prevent the manufacturer who procures his supplies and disposes of his products by means of interstate commerce from engaging in business at all necessarily places restraints upon such commerce." The element of the elimination of competition was present in the Pennsylvania Company Case and was not present in the Loewe Case, but this does not alter the fact that the decision in each case was distinctly that the combination in question directly restrained interstate commerce because its object and purpose were to prevent manufacturers having interstate business from continuing to carry it on.

[5] Bearing the principle of these cases in mind, let us consider the fundamental question whether the conspiracy to "run a corner" described in the indictment directly restrained interstate commerce. No other restraint—as is well settled by numerous authorities—would contravene the act.

Now there are no allegations in the present indictment, as there were in the Loewe and Pennsylvania Cases, that the purpose of the conspiracy was to restrain interstate commerce. No intent to obstruct such commerce is averred. But it is said by the government that the parties to a conspiracy are presumed to intend the necessary and inevitable consequences of their acts. Assuming that this is so and that it is unnecessary to allege any specific intent in charging an offense under this statute, we must turn to see what the indictment says are the "necessary and unavoidable results" of the acts of the conspirators in "running a corner in cotton." And in making such examination we must also assume that the allegations of the results to follow the cospiracy are more than the conclusions or economic theories of the pleader and amount to allegations of fact. But we must likewise bear in mind that the indictment does not specifically allege that the conspiracy directly obstructed interstate commerce. The necessary and unavoidable result of the acts stated might be an obstruction to interstate commerce without it following that the effect upon such commerce would be direct. The indirect consequences of acts may be as unavoidable as the direct results. Consequently, while I will accept as allegations of fact the averments of the indictment concerning the necessary and unavoidable results of the acts of the conspirators, I cannot consider such averments as precluding examination into the question whether it appears that the direct, as distinguished from the

indirect, incidental, or remote, effect of the alleged conspiracy was to restrain or obstruct interstate commerce.

Manifestly the result which the conspirators aimed at was to compel speculators short of cotton to settle at abnormally high prices; a process sometimes called "squeezing the shorts." Manifestly, also, the raising of prices in other cotton markets than the New York Cotton Exchange was in itself no part of the scheme of the conspirators. Still, prices of cotton are so correlated that it may be said that the direct result of the acts of the conspirators was to be the raising of the price of cotton throughout the country. But it does not follow. in my opinion, that because exceedingly high prices of cotton were to be brought about interstate commerce was to be directly affected and obstructed. On the contrary, it seems clear that any effect upon interstate commerce in the way of curtailing shipments or otherwise would have been merely incidental to the high prices.

[6] The broad contention of the government is that any combination which interferes with the right of the manufacturer to purchase a commodity moving in interstate commerce at prices determined by the competitive law of normal market conditions directly restrains interstate commerce and violates the federal anti-trust statute. I cannot assent to this proposition. There is no direct relation between prices and interstate commerce. The volume of shipments does not necessarily depend upon the lowness of prices. Innumerable other factors enter into the problem. The continuation of normal market conditions might or might not curtail interstate commerce. But if it were curtailed by upset market conditions that which produced such result would still only indirectly affect such commerce.

Let us test the strength of the government's contentions in the application. A general strike among employés in cotton mills might cause manufacturers "wholly to close and cease to operate their several factories." As a result interstate shipments of cotton would be curtailed, but such a combination would fall far short of that denounced in Loewe v. Lawlor, supra. A conspiracy among "night riders" to burn tobacco warehouses might, if carried out, increase prices and would almost "unavoidably and necessarily" diminish the volume of possible interstate shipments. Still such a conspiracy would be left to the states for punishment. The direct result would be injury to the warehouse owners. The effect upon interstate commerce would be incidental and indirect. A conspiracy might be formed to injure the credit of persons engaged in mercantile business which might be so extensive as to cause failures and a consequent material diminution in the volume of interstate shipments. But the direct effect of the conspiracy would be the injury to the merchants, and the effect upon interstate commerce would be altogether remote. Many other illustrations might be given. These, however, are sufficient, in my opinion, to demonstrate the unsoundness of the government's contention. For these reasons, I reach the conclusion that the so-called "corner counts" fail to show any direct effect upon interstate commerce, and consequently fail to charge violations of the statute.

The next question is whether the third count charges a violation of the statute. The offense charged in this count is a conspiracy "to monopolize by the method in this count of this indictment hereafter set forth a part of the trade and commerce among the several states," and the material averments with respect to such method are as follows:

"Said conspirators were to become members of and engaged in an unlawful combination in the form of an agreement, under which they were * * * severally to purchase * * * cotton * * * so much that together they would * * * have enough * * * cotton * * * to enable them * * * to control the price of such cotton, and severally to demand arbitrary, excessive and monopolistic prices for the same upon the sale thereof by them respectively to spinners and manufacturers other than said conspirators. * * * "

This count is spoken of in the briefs as the power count, and it is claimed by the government to charge a conspiracy to monopolize by acquiring enough cotton to give power to fix arbitrary and excessive prices.

[7] It is undoubtedly true, under the law as it stands, that trade and commerce are "monopolized" within the meaning of the federal statute, when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient.

[8] As just indicated, however, the power of control amounting to a monopoly must be held by persons acting in concert. No monopoly exists when individuals, each acting for himself, own large quantities of a commodity. Under such conditions none of the evils of monopoly is present. The inherent and collateral power incident to concerted action is absent. It is true that the individuals might unite and create a monopoly, but they might not, and until they do there is no monopoly.

[9] A conspiracy to monopolize is a conspiracy to create a monopoly, and unless it appears from the indictment that the conspiracy in question, if successfully carried out, would have resulted in a monopoly, no violation of the federal statute is charged. And here is where the allegations are lacking. Construing them fairly, it cannot be said that it is averred that these defendants, as the result of this conspiracy, were to have anything more or other than individual power to demand monopolistic prices. It is alleged that purchases of cotton were to be made "severally" of such amounts that the defendants could "severally" demand arbitrary and excessive prices upon the sale thereof by them "respectively." I cannot find any clear allegations of collective power. The power to control prices which this conspiracy was to put into the hands of the defendants was several and not joint—a power over individual, and not over aggregate, possessions—and if they had obtained it they would not have obtained a monopoly. The offense charged is not a conspiracy to create a monopoly, but a conspiracy to give persons power to create one if they should desire to do so and should enter into a further agreement to

that end. And while it was not necessary, in my opinion, under the law as it now stands, to allege that the defendants exercised the power to control prices, it was necessary to state some agreement among them that they would act together should there be occasion for so doing.

The federal anti-trust statute is a powerful instrument for the protection of the people from combinations and monopolies. But it is a stringent statute which is carried far when it is used as the basis of a criminal prosecution of persons for conspiring to monopolize by obtaining power over prices without charging any intention to exercise such power by fixing prices. And when such a prosecution is had, a court is not drawing refined distinctions nor insisting upon technicalities when it requires the indictment to charge clearly and unmistakably that the object of the conspiracy was to put such power of monopoly into the hands of the defendants acting collectively and not each for himself. Doubt as to the meaning of the indictment in such a case should be resolved against the government.

[10] The final question to which it is necessary to give any extended consideration is whether the fifth and sixth counts are subject to the objection of duplicity because they each charge the commission of two substantive offenses. The defendants contend that the fifth count charges a combination in restraint of trade, and then bring in by reference all the material allegations of the first count, which charges a conspiracy in restraint of trade, and therefore it is urged that there is a misjoinder of two crimes in one count. Similar contentions are made with respect to the sixth count. In my opinion the contentions of the defendants are not well founded. Referring to the charging part of each count it will be found that only a single offense is charged against the defendants and the references in other parts of the counts are only for the purpose of giving details of the offenses charged.

The grounds of the demurrers and motions to quash which have not been already noticed seem not to require discussion.

The demurrers, so far as directed against the third, fourth, seventh, and eighth counts of the indictment are sustained, and in other respects are overruled. The motions to quash are denied.