## STATE v. W. H. COYLE *et al.*

Nos. A-662, A-665.   Opinion Filed March 1, 1913.

(130 Pac. 316.)

1.    **MONOPOLIES** — Criminal Prosecutions — Indefiniteness of Anti-Trust Act.   The anti-trust law of 1908 (Comp. Laws 1909, secs. 8800-8819) is not void for uncertainty, but the definitions of "trusts," "monopolies," and "unlawful combinations in restraint of trade and against public policy" therein contained are sufficient to define the offenses prescribed by said statute.

2.    **CONSTITUTIONAL LAW** — Unjust Discrimination—Anti-Trust Law.   An exception in favor of labor unions from an anti-trust law (Comp. Laws 1909, secs. 8800-8819) may constitute such a reasonable classification as will not invalidate such law upon the ground that it discriminates against and does not afford equal protection to all of the citizens of the United States.

3.    **MONOPOLIES**—Indictment—Sufficiency.   In an indictment or information for any offense named in our anti-trust legislation it is sufficient to state the purpose or facts of the trust, monopoly, or unlawful combination in restraint of trade, and that the accused is a member of, acted with or in pursuance of it, or aided or assisted in carrying out its purpose, without giving the name or description of such trust, monopoly, or unlawful combination, or stating how, when, or where it was created.

4.    **MONOPOLIES** — Indictment—Sufficiency.   For indictments for violating the provisions of our anti-trust law (Comp. Laws 1909,

secs. 8800-8819), which are held not to be bad for duplicity and to sufficiently state the offense charged, see opinion.

(Syllabus by the Court.)

Motion for rehearing. Denied.

For former opinion, see 7 Okla. Cr. 50, 122 Pac. 243.

*Charles West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

*Flynn, Chambers, Lowe & Richardson,, Devereux & Hildreth, Dale & Bierer,* and *C. G. Hornor,* for appellees.

FURMAN, J. Counsel for appellees have filed a printed brief of 105 pages in support of their motion for a rehearing, in which the entire field of legal learning has been exhausted and everything has been said which ingenuity could suggest and argument could enforce from their standpoint.

Without intending in the least to be disrespectful to any court, yet it is a fact well known to the legal profession and to the country, that many of our appellate courts, both state and federal, have in the past been largely dominated by men, who, before their elevation to the bench and while they were practicing lawyers, were more or less under monopolistic influences. It matters not how honest, able, and learned a judge may be, his decisions are more or less colored by the viewpoint from which he considers questions which are submitted to him. Two judges of equal learning, ability, and integrity considering the same question from different viewpoints may, and often do, reach different conclusions. So the question of the viewpoint from which a case is considered is of the utmost importance. The viewpoint of a judge can sometimes be discovered by inquiring into his antecedents. All judges were once lawyers. A lawyer is necessarily and involuntarily affected by the views and interests of his clients with whom he is identified and upon whom he is dependent for his income. In fact, the lawyer who cannot sympathize with his clients, and who does not make their cause his cause, never attains eminence at the bar.

It is no secret that corporations and monopolies are active and tireless in their efforts to secure control of the appellate courts

of this country and thereby by judicial construction defeat the will of the people as expressed in legislation. As these influences are powerful and well organized, they often succeed in securing the election or appointment of judges who are under obligations to them for past favors. This evil has been carried to such an extent and has become so open and notorious that many good people have almost lost hope and have largely ceased to have confidence in the fairness, impartiality, and integrity of the courts where corporations, trusts, and monopolies are concerned. This constitutes one of the most alarming conditions now existing in America. A judge may desire to be entirely honest, yet if he is under influences which are antagonistic to the rights of the people, he will make an exceedingly dangerous judge. We are repeatedly told in the Bible that "a gift doth blind the eyes of the wise and pervert the words of the righteous." Deut. xvi, 19; Ex. xxiii, 8. So we have the highest possible authority for the statement that, although a judge may ordinarily be a wise and righteous man, yet, if he has been the recipient of favors at the hands of trusts and monopolies, he cannot safely be relied upon to reach just and correct conclusions in cases where their interests are involved, and that in such cases his eyes may become blind to the rights of the people and his judgment may become perverted without his being aware of the fact. It may not be popular in some circles to say this, but we believe that it is the absolute truth and that this is the main cause of the manifest bias of many of our courts against all anti-trust legislation.

In view of the antecedents of many of the appellate judges of the United States and the general disposition which exists among American lawyers and courts to blindly follow precedents, and the further fact that trusts and monopolies always secure the services of the best lawyers obtainable who have the ability to make the worse appear to be the better cause, we are not surprised at the number and respectability of the authorities supporting the contentions of counsel for appellees. But we are of the opinion that they prove too much, for if they are to be followed it would be almost impossible to frame a law which

would reach and destroy conspiracies in restraint of trade and commerce. To sustain the contentions of counsel for appellees would be in effect to decide that in the state of Oklahoma trusts and monopolies are practically above and superior to the law, and that they may at pleasure through their combinations and conspiracies grind the people like grain beneath the upper and nether stone, take from the mouth of labor the bread which it has earned, and divert the stream of wealth produced by hard and honest toil from its rightful channels and pour it into the undeserved and already overflowing coffers of the few.

In this case, as in all other such cases, appellees are represented by lawyers who have few equals and no superiors in the United States and who have their clients' interests at heart. They have certainly used every legal weapon at their command in their presentation of their side of the case. With this we find no fault. It is as it should be. We admire and commend their zeal and ability. But we are not unmindful of our duty to the entire people of Oklahoma, and that we should carefully consider the ground upon which we act and the consequences and effects of the decision which they have asked us to render. If we concede the premises which they have laid down and follow the precedents which they have cited, we freely admit that we would be involved in a maze of perplexities from which we would find it difficult to extricate ourselves and escape from the conclusions at which they would have us arrive. We differ radically with counsel for appellees at the very threshold of the case as to the principles which should control in its decision. It would therefore be useless consumption of time to consider in detail the cases which they have cited and the arguments which they have made. As we understand it, the ancient learning of the common law has outlived the conditions which brought it into existence and has survived the reasons upon which it was based. In the early case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, this court announced that precedents should be weighed and not counted, and that we would not follow any precedent unless we understood and approved the principles upon which it was based, and that a multiciplicity of errors did not make right that which was

based upon false premises and was therefore erroneous at its very inception.

In the case of *Byers v. Territory,* 1 Okla. Cr. 702, 103 Pac. 534, this court said:

"Justice demands that in the administration of law its processes should never be allowed to become a game of skill between contending counsel. There has been entirely too much of this in the past. It has resulted in the miscarriage of justice in many cases and has bred a spirit of disgust for law and contempt for courts in the public mind."

In the same case this court also said:

"Appellate courts should faithfully and fearlessly do their duty and decide every question presented with reference to the substantial merits of the case in which it arises. In this way only can justice be administered. Ignoring justice and deciding cases upon technicalities has not only largely lost the courts the confidence and respect of the people, but it has also greatly alarmed the profession of law itself."

We have endeavored to adhere strictly to these principles in passing upon all questions submitted to us. As applicable to the questions now before the court, we reiterate what was said in the case of *Turner v. State, ante,* 126 Pac. 452, as follows:

"These statutes are largely a radical departure from the old common law with reference to criminal law and criminal procedure, and were evidently intended to place criminal law in Oklahoma upon the strong, sound, and safe basis of common sense, reason, and justice. It is on account of these statutes that some parties are unable to understand the policy of this court. We are simply trying in good faith to discharge the obligation of our oaths of office, for we have sworn that we would support the Constitution and laws of Oklahoma. If those who are disposed to criticise this court for its policy would place themselves in the position which we occupy, we believe that they would take a different view of this matter. It is natural for us to be prejudiced in favor of those things with which we are familiar. The writer knows from personal experience that it is an exceedingly difficult thing to break away from preconceived ideas and conditions, for the principles embodied in these statutes are the reverse of the school of law in which he was educated and which he practiced for many years. Herein lies the greatest difficulty in the way of reform in legal procedure. Judges and lawyers have been educated in and are accustomed to an antiquated sys-

tem of procedure, and have been taught to look with reverence upon old legal theories, and are thereby unduly biased against any change in legal procedure. The result is that, even when the Legislatures attempt to reform legal procedure, many courts and lawyers are disposed to construe such legislation in the light of their preconceived ideas. They often do this without being aware of it, and in this way the purpose intended to be accomplished by remedial legislation is defeated. While this court respects the wisdom of the past and can see much in it to admire and to follow, yet we also believe that the world should be ruled by the living, and not by the dead; that the law should keep even step with the march of civilization and the necessities of society in the relation of its members to each other; and that the people have the right by legislation to alter the rules of legal procedure. When the Legislature has made a change in legal procedure, it is the duty of the courts to lay aside their preconceived ideas, and construe such legislation according to its spirit and reason. We are not in sympathy with those who believe in the infallibility of the common-law rules of criminal procedure, or that form, ceremony, and shadow are more important than substance, reason, and justice. This court does not propose to grope its way through the accumulated dust, cobwebs, shadows, and darkness of the evening of the common-law rules of procedure; but it will be guided, as the statutes above quoted direct, by the increasing light and inspiration of the rising sun of reason, justice, common sense, and progress. As was well said in the November, 1911, issue of the Journal of the American Institute of Criminal Law and Criminology: 'As some people think more of a man's clothes and style than of his principles, so some lawyers are concerned more with the mere procedure in a trial than with the triumph of the party that ought to succeed on the merits of the case. The quibbling of the logicians and disputants of the middle ages has often formed the subject for satire; but our present-day legal disputes over technical questions of procedure are pettier, less profitable, and more indefensible than the fine-spun arguments and theories of the much-abused schoolmen of the middle ages.'

"The effect of the statutes hereinbefore quoted is to prevent disputes over mere technical questions of procedure. If properly construed, they destroy legal quibbling. Their purpose is to eliminate from a trial all immaterial matters, and thereby better secure the triumph of the party who ought to succeed upon the actual merits of the case. Sections 2027 and 6487 repeal the common-law doctrine of a strict construction of penal statutes, and substitute in its place the equitable doctrine of a liberal con-

struction of such statutes. Courts of this state are not bound by the strict letter of a penal statute, but must construe it according to its spirit and reason, so as to enable it to reach and destroy the evil at which it was aimed, and thereby effect the object for which it was enacted and promote justice. Section 6957 with one stroke of the pen wipes out and destroys that ancient heresy of the common law that error presumes injury, and by its terms absolutely binds this court to disregard any and all technical errors, defects, and exceptions, unless the party complaining thereof can show from the record that he has been deprived of some substantial right thereby to his injury. Sections 6704 and 6705 do away with all of the artificial distinctions of the common law in indictments or informations, and destroy that ancient refuge, stronghold, and citadel of defense of murderers, thieves, perjurers, and all other desperate criminals, that indictments must be certain to a certain intent in every particular, and place them upon a common-sense basis, and make an indictment sufficient if a person of ordinary understanding can know what was intended, and forbid the courts from holding insufficient any indictment or information, unless the defects therein are of such a character as to prejudice the substantial rights of the defendant upon the merits. All of these statutes are contrary to the common law and to the procedure in force in many of the states, but they are binding upon the courts of this state. For this reason it is an utter waste of time for lawyers in their briefs and oral arguments to cite and discuss decisions from states which have different statutes. It is not a question as to whether we like these statutes. It is enough for us to know that they are the law of Oklahoma. This court is not a forum of legislation. Our duty is ended when we obey the law, and we should either do this or resign and allow others to take the places which we occupy, who will regard the obligation of their oaths of office. The great trouble with the judiciary of the entire country is that many judges try to so twist and evade statutes as to enable them to substitute their own private views for regularly enacted statutes. This evil has become so great that there is now more judge-made law in the United States than there is law enacted by the people. If the courts do not correct this evil, no one can tell what the result will be. It will end in one of three things, viz., peaceable reformation, bloody revolution, or a judicial oligarchy. This court proposes to do its duty by rendering a ready and willing obedience to the regularly enacted laws of Oklahoma, and by doing all in its power to see that they are followed by the trial courts of this state."

In the case of *Burns v. State, ante,* 129 Pac. 657, this court said:

"It is the duty of this court to decide all questions submitted to it in the light of the moral atmosphere in which they are surrounded, and never to permit the law to become a cloak of protection for men to trample upon the sacred rights of others, and bid open defiance to decency and the best interests of society."

From this standpoint we reaffirm all that was said by Judge Doyle in the original opinion in this case. See 7 Okla. Cr. 50, 122 Pac. 243.

There are only three questions with reference to which we desire to make any additional suggestions: First. It is contended that the law upon which the indictments in these cases are founded is void for uncertainty. Second. It is contended that, as certain combinations of labor are excepted from the penalties of the law, thereby all classes of citizens are not afforded that equal protection of the law which the Constitution of the United States guarantees to every citizen of the United States. Third. It is contended that, even if the Oklahoma anti-trust law is valid, the indictments do not charge any offense against any of the appellees.

First. The statutes upon which these indictments are founded are copied in full in the original opinion of this court. See *State v. Coyle et al.,* 7 Okla. Cr. 50, 122 Pac. 243. They are also to be found on pages 1766, 1767, 1768, 1769, and 1770, Comp. Laws 1909. If the Legislature had adopted the the plan suggested by counsel for appellees and had attempted to give a fixed definition of a trust or of a monopoly, it would have been found by experience that many abuses would arise to which the law would not be applicable, because they would not be included in the fixed definitions given. It would doubtless have been very gratifying to those persons engaged in such unlawful undertakings if the Legislature had attempted to give fixed definitions of trusts and monopolies, for then their able attorneys could point out how the same purposes could be accomplished by a slight variation in the methods used, and thereby they could do as they wished and escape the penalties of the law prescribed for a viola-

tion of the fixed definitions. It is simply impossible to please those persons who seek to violate the law. If a fixed definition of a trust and of a monopoly had been given, then they would have so shaped their business as to place it outside of this fixed definition, and under their favorite doctrine of a strict construction of penal statutes they would have been allowed to defy the law and rob the people at pleasure. The only way in which they can be reached is by general definitions and the doctrine of a liberal construction of penal statutes, and that is just what we have in Oklahoma; hence the law is going to be enforced, and those gentlemen must either abstain from their illegal conduct or suffer the consequences. We think that the definitions contained in the statutes are as certain as the nature of the evils at which they are aimed will admit. It would be unreasonable and would defeat the very objects of the law to require greater certainty than the nature of the subject-matter under consideration would reasonably admit. Trusts and monopolies can be organized and built up under so many different and varying conditions that nothing except a general definition would grant relief from the evils which they inflict upon the people. We do not think that there is any danger of innocent men engaged in legitimate business enterprises being prosecuted and convicted under the provisions of our anti-trust law. We think it is the best the Legislature could do under the circumstances.

For these and the reasons given in the original opinion of this court in this case we cannot hold that the law is invalid for uncertainty.

Second. As a matter of first impression the second contention of counsel for appellees appears to present the most serious objection urged against the anti-trust law of Oklahoma. That objection is based upon section 4042, Comp. Laws 1909, which was enacted at the same session of the Legislature and at a later date than the passage of the anti-trust law and was intended to and does constitute a part of the anti-trust law itself. By the provisions of section 4042 no agreement, combination, or contract by or between two or more persons to do or procure to be done, or not to do or procure to be done, any act in contemplation or

furtherance of any trade dispute between employers and employees in the state, shall be deemed as criminal, nor shall those engaged therein be indictable or otherwise punishable for the crime of conspiracy, if such act committed by one person would not be punishable as a crime, .nor shall such agreement, combination, or contract be considered as in restraint of trade or commerce, nor shall any restraining order or injunction be issued in relation thereto, provided that force or violence are not used.

The contention of counsel for appellees is that, if the law protects combinations of labor or of any class of citizens of the state, it must also protect combinations of capital; otherwise a class of citizens who are not afforded this protection are discriminated against and deprived of that equal protection of the laws which the Constitution of the United States guarantees to every citizen of the United States. A careful consideration of this matter will show that the contention of counsel for appellees is not tenable. It must be conceded that the Legislature has the right and power to make reasonable classifications with reference to any proper subject of legislation. The assumption of counsel for appellees is that the rights of capital are equal to the rights of labor. Good morals do not sustain this assumption. While labor and capital are both entitled to the protection of the law, it is not true that the abstract rights of capital are equal to those of labor, and that they both stand upon an equal footing before the law. Labor is natural; capital is artificial. Labor was made by God; capital is made by man. Labor is not only blood and bone, but it also has a mind and a soul, and is animated by sympathy, hope, and love; capital is inanimate, soulless matter. Labor is the creator; capital is the creature. If all of the capital in the world was destroyed, a great injury would thereby be inflicted upon the entire human race; but the bright minds, the brave hearts, and the strong arms of labor would in time create new capital, and thus the injury would be ultimately cured. If all of the labor on earth was destroyed, capital would lose its value and become absolutely worthless. The strength and glory of this country lies, not in its vast accumulations of capital, but

it depends upon the arms that labor, the minds that think, and the hearts that feel. Labor is always a matter of necessity. Capital is largely a matter of luxury. Labor has been dignified by the example of God. The Savior of mankind was called the "carpenter's son." We are told in the Bible that "the love of money is the root of all evil." This statement is confirmed by the entire history of the human race. The love of money is the cause of the organization of trusts and monopolies. With what show of reason and justice, therefore, can the advocates of monopoly be heard to say that capital is the equal of labor? But if we concede that the assumption of counsel for appellees is well founded, and if we arbitrarily and in disregard of good morals place capital and labor upon an absolute equality before the law, another difficulty confronts them. Capital organizes to accomplish its purposes. Then, according to their own logic, it would be a denial of equal rights to labor to deny to it the right to organize and act without a breach of the peace to meet the aggression of capital.

We therefore hold from either view that the provisions of section 4042 constitute a reasonable classification such as the Legislature had the right to make, and that the anti-trust law of Oklahoma does not on this account violate the clause of the Constitution of the United States which guarantees equal protection to all of the citizens of the United States. We deny that trusts and monopolies are entitled to protection as citizens of the United States.

Third. Do the indictments charge an offense against appellees? The indictments in substance allege that at the date mentioned therein the appellees entered into a conspiracy, agreement, and combination to form a pool or trust for the purpose and with the intent to restrain trade and commerce in Logan county in cotton and the products thereof, all of which was against public policy and was done with the illegal, unlawful, and felonious intent of monopolizing the market for cotton and its products and to control and regulate the prices thereof, unreasonably in restraint of trade and commerce and against public policy in Logan county at said date. The indictments then go further and

allege by name the location of the different gins which appellees owned and controlled in Logan county in furtherance of such conspiracy, and that in pursuance of said conspiracy appellees did not operate certain specified gins, and that thereby the farmers of Logan county were forced and compelled to patronize the gins which were run and operated by appellees in pursuance of said agreement, and that thereby competitive bidding on seed cotton or ginning seed cotton in Logan county was destroyed and other buyers of both lint cotton, seed cotton, and cotton seed were excluded from the market of Logan county, and that as a result thereof appellees had raised the price of ginning cotton from $3.50 to $5 per bale, and that said price of $5 per bale for ginning cotton was unreasonable. The indictments are set out in full in the original opinion in this case. It is not necessary for us at this time to decide just what allegations an indictment or information should contain in charging the offense of a conspiracy in restraint of trade, but we do not think that appellees can be heard to complain that the indictments in these cases are duplicitous because they allege the specific acts done by appellees in pursuance of the conspiracy charged, as all of these acts relate to the same general purpose and are only so many different parts of the same general conspiracy. It is the agreement, contract, or combination in restraint of trade under which the acts alleged were committed which constitutes the crime of conspiracy.

The seventh section of our anti-trust law is as follows:

"In an indictment or information for any offense named in this act it is sufficient to state the purpose, or facts, of the trust, monopoly, unlawful combination in restraint of trade or commerce, and that the accused is a member of, acted with, or in pursuance of it, or aided or assisted in carrying out its purpose without giving its name, or description, or stating how, when or where it was created."

It occurs to us that the allegations of these indictments fully meet the requirements of this provision of our statute.

Section 6704, Comp. Laws 1909, provides that an indictment is sufficient if it can be understood therefrom that the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and

in such a manner as to enable a person of common understanding to know what is intended.

We think that the indictments do not charge separate and distinct offenses, but that they each do charge one offense only, and that is that appellees had entered into an illegal conspiracy in restraint of trade and against public policy, for the purpose of preventing competition in the matter of ginning cotton and also in the matter of the price of cotton and cotton seed in Logan county, and of forcing the farmers of that section of the state to patronize gins owned by appellees, and of forcing such farmers to pay an unjust and unreasonable price for ginning their cotton. We think that a person of common understanding could not be mistaken as to what was intended by the allegations contained in these indictments, and, if this is true, all that the law requires has been complied with. The very idea of coercion and force, except when necessary to secure obedience to law, is repulsive to reason and natural justice and has always been odious to the American people. While Oklahoma has many different resources, yet agriculture is and will remain to be her chief reliance. Those who cultivate the soil constitute the most numerous portion of our population, and certainly there are none more meritorious. Their isolated condition and the constant attention which their farms require renders effective organization and united action among them exceedingly difficult, if not practically impossible. Of all classes they are the easiest victims of greed and conspiracies and must depend entirely upon the law for their protection. Agriculture is the only occupation followed by men which was instituted by divine command. Savages and barbarians may exist without the cultivation of the soil, but civilization in its true sense begins and ends with the plow. The farmer gives value received for every dollar he digs out of the ground. He not only earns every dollar he gets, but he earns a great many dollars he never gets. For these reasons the facts charged in these indictments constitute a natural crime, for their result would be to enable appellees to reap where they had not sown and to eat in idleness the bread earned by the sweat of the farmer's brow. A single drop of sweat upon the brow of honest labor

shines more brightly and is more precious in the eyes of God and is of more benefit to the human race than all of the diamonds that ever sparkled in the crown of any king. If the state did not protect the farmers of Oklahoma against such conspiracies as this, the law would be a miserable, contemptible farce, a snare, a mockery, a burden, and a delusion.

We are glad to know that there is a growing disposition upon the part of the appellate courts of the United States to recognize the justice of and to sustain anti-trust legislation, and that common sense and substantial justice are taking the place of the obsolete and unjust distinctions and intricacies of the common law. This is shown by an opinion rendered on the 13th day of January, 1913, by the Supreme Court of the United States in the case of *United States v. James A. Patten.* Patten was prosecuted in the United States Circuit Court for the Southern District of New York for violating the anti-trust act of the United States by running a corner in the cotton market. Demurrers to the indictment were sustained in the lower court and Patten was discharged. 187 Fed. 664. The case was carried by the government by writ of error to the Supreme Court of the United States. In reversing the judgment of the lower court and in holding that the indictment did charge an offense against the law, the Supreme Court of the United States said:

"Although ruling that there was no allegation of a specific intent to obstruct interstate trade or commerce and that the raising of prices in markets other than the Cotton Exchange of New York was 'in itself no part of the scheme,' the court assumed that the conspirators intended 'the necessary and unavoidable consequences of their acts,' and observed that 'prices of cotton are so correlated that it may be said that the direct result of the acts of the conspirators was to be the raising of the price of cotton throughout the country.'

"Upon the second argument the defendants contended, and counsel for the government expressly conceded, that 'running a corner' consists, broadly speaking, in acquiring control of all or the dominant portion of a commodity with the purpose of artificially enhancing the price, 'one of the important features of which,' to use the language of the government's brief, 'is the purchase for future delivery, coupled with a withholding from sale for a limited time'; and, as this definition is in substantial

accord with that given by lexicographers and juridicial writers, we accept it for present purposes, although observing that not improbably in actual usage the expression includes modified modes of attaining substantially the same end.

"Whilst thus agreeing upon what constitutes running a corner, the parties widely differ as to whether what is so styled in this instance contained the elements necessary to make it operative. The point of difference is the presence or absence of an adequate allegation that the purchasing for future delivery was to be coupled with a withholding from sale, without which, it is conceded by both parties, the market could not be cornered. But the solution of the point turns upon the right construction of the counts, and that, as has been indicated, is not within our province on this writ of error. We must assume that the counts adequately allege whatever the Circuit Court treated them as alleging. Its opinion given at the time, although not containing any express ruling upon the point of difference, shows that the counts were treated as alleging an operative scheme, one by which the market could be cornered. The court spoke of it as 'contrary to public policy,' or 'arbitrarily controlling the price of a commodity,' and as 'positively unlawful in any state having a statute against corners.' Evidently, it was assumed that every element of running a corner was present. We accordingly indulge that assumption, but leave the parties free to present the question to the District Court for its decision in the course of such further proceedings as may be had in that court.

"We come, then, to the question whether a conspiracy to run a corner in the available supply of a staple commodity, such as cotton, normally a subject of trade and commerce among the states, and thereby to enhance artificially its price throughout the country and to compel all who have occasion to obtain it to pay the enhanced price or else to leave their needs unsatisfied, is within the terms of section 1 of the anti-trust act, which makes it a criminal offense to 'engage in' a 'conspiracy in restraint of trade or commerce among the several states.' The Circuit Court, as we have seen, answered the question in the negative; and this, although accepting as an allegation of fact, rather than as a mere economic theory of the pleader, the statement in the counts that interstate trade and commerce would necessarily be obstructed by the operation of the conspiracy. The reasons assigned for the ruling, and now pressed upon our attention, are: (1) That the conspiracy does not belong to the class in which the members are engaged in interstate trade or commerce and agree to suppress competition among themselves; (2) that running a corner, in-

stead of restraining competition, tends, temporarily at least, to stimulate it; and (3) that the obstruction of interstate trade and commerce resulting from the operation of the conspiracy, even although a necessary result, would be so indirect as not to be a restraint in the sense of the statute.

"Upon a careful reflection we are constrained to hold that the reasons given do not sustain the ruling and that the answer to the question must be in the affirmative.

"Section 1 of the act, upon which the counts are founded, is not confined to voluntary restraints, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints, as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce or restrict the common liberty to engage therein. *Loewe v. Lawler*, 208 U. S. 274, 293, 301 [28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815]. As was said of this action in *Standard Oil Co. v. United States*, 221 U. S. 1, 59 [31 Sup. Ct. 502, 515 (55 L. Ed. 619, 34 L. R. A. [N. S.] 934, Ann. Cas. 1912D, 734)]: 'The context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade, because it groups as within that class, not only contracts which were in restraint of trade in the subjective sense, but all contracts or acts which theoretically were attempts to monopolize, yet which in practice have come to be considered as in restraint of trade in a broad sense.'

"It well may be that running a corner tends for a time to stimulate competition, but this does not prevent it from being a forbidden restraint; for it also operates to thwart the usual operation of the laws of supply and demand, to withdraw the commodity from the normal current of trade, to enhance the price artificially, to hamper users and consumers in satisfying their needs, and to produce practically the same evils as does the suppression of competition. Of course, the statute does not apply where the trade or commerce affected is purely intrastate. Neither does it apply, as this court often has held, where the trade or commerce affected is interstate, unless the effect thereon is direct, not merely indirect. But no difficulty is encountered in applying these tests in the present case when its salient features are kept in view.

"It was a conspiracy to run a corner in the market. The commodity to be cornered was cotton, a product of the Southern states, largely used and consumed in the Northern states. It was a subject of interstate trade and commerce, and through that

channel it was obtained from time to time by the many manufacturers of cotton fabrics in the Northern states. The corner was to be conducted on the Cotton Exchange in New York City, but by means which would enable the conspirators to obtain control of the available supply and to enhance the price to all buyers in every market of the country. This control and the enhancement of the price were features of the conspiracy upon the attainment of which it is conceded its success depended. Upon the corner becoming effective, there could be no trading in the commodity save at the will of the conspirators and at such price as their interests might prompt them to exact. And so, the conspiracy was to reach and to bring within its dominating influence the entire cotton trade of the country. Bearing in mind that such was the nature, object, and scope of the conspiracy, we regard it as altogether plain that by its necessary operation it would directly and materially impede and burden the due course of trade and commerce among the states, and therefore inflict upon the public the injuries which the anti-trust act is designed to prevent. See *Swift & Co. v. United States,* 196 U. S. 375, 396-400 [25 Sup. Ct. 276, 49 L. Ed. 518]; *Loewe v. Lawlor,* 208 U. S. 274 [28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815]; *Standard Oil Co. v. United States,* 221 U. S. 1 [31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734]; *United States v. American Tobacco Co.,* 221 U. S. 106 [31 Sup. Ct. 632, 55 L. Ed. 663]. And that there is no allegation of a specific intent to restrain such trade or commerce does not make against this conclusion, for, as is shown by prior decisions of this court, the conspirators must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result. *Addyston Pipe & Steel Co. v. United States,* 175 U. S. 211 243 [20 Sup. Ct. 96, 44 L. Ed. 136]; *United States v. Reading Co.,* 226 U. S. 324, 370. [33 Sup. Ct. 90, 57 L. Ed. ——].

"The defendants place some reliance upon *Ware & Leland v. Mobile County,* 209 U. S. 405 [28 Sup. Ct. 526, 52 L. Ed. 855, 14 Ann Cas. 1031], as showing that the operation of the conspiracy did not involve interstate trade or commerce; but we think the case does not go as far and is not in point. It presented only the question of the effect upon interstate trade or commerce of the taxing by a state of the business of a broker who was dealing in contracts for the future delivery of cotton, where there

was no obligation to ship from one state to another; while here we are concerned with a conspiracy which was to reach and bring within its dominating influence the entire cotton trade of the country and which was to be executed, in part only, through contracts for future delivery. It hardly needs statement that the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *Montague & Co. v. Lowry,* 193 U. S. 38, 45, 46 [24 Sup. Ct. 307, 48 L. Ed. 608]; *Swift & Co. v. United States,* 196 U. S. 375, 386, 387 [25 Sup. Ct. 276, 49 L. Ed. 518]."

We are entirely satisfied with the citation and discussion of authorities contained in the original opinion of this court and merely quote the case of *United States v. Patten, supra,* because it was rendered since the rendition of the original opinion in this case and is in harmony with the conclusion at which we had previously arrived.

The motion for a rehearing is denied, and the judgment of the district court sustaining the demurrers to the indictments in each of these cases is set aside, and the cases are remanded, with directions to the district court to proceed therein in accordance with the views expressed in the original opinion of this court and in this opinion.

ARMSTRONG, P. J., and DOYLE, J., concur.