## JOSEPHINE CARROLL v. STATE.

No. A-226.    Opinion Filed November 23, 1910.

BAWDY HOUSES—Maintenance—Evidence — General Reputation of House. In prosecutions for keeping a house of ill fame it is competent to introduce evidence of the general reputation of the house in the neighborhood in which it is situated, as to its being a place where lewd and lascivious persons of both sexes congregate for the purpose of unlawful co-habitation or sexual intercourse.

(Syllabus by the Court.)

*Appeal from Canadian County Court; H. L. Fogg, Judge.*

Defendant was convicted for keeping a house of ill fame, and fined one hundred dollars. Defendant appealed. Affirmed.

*R. B. Forrest,* for plaintiff in error.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, PRESIDING JUDGE. The counsel for the defendant relies upon the following assignment of errors:

"(1) The evidence does not establish sufficient facts to constitute a public offense. (2) No crime is proved by the evidence. (3) The verdict is against the law. (4) The judgment is contrary to law. (5) The court erred in refusing to direct the jury to acquit the defendant. (6) The court erred in overruling the motion of the defendant for a new trial."

These may all be considered under the general objection that the evidence is not sufficient to support the verdict.

C. E. Gunn testified that the defendant paid rent upon and occupied the building in which the offense is alleged to have been committed at the date of the alleged offense.

Mr. Chambers testified as follows:

"Direct examination by J. W. Clark: Q. State your name to the jury. A. L. A. Chambers. Q. You are sheriff of this county, Mr. Chambers? A. Yes, sir. Q. And were on the 19th day of December, 1908? A. Yes, sir. Q. Are you acquainted with the supposed rooming house that was being operated at that time by Josephine Carroll? A. I was. Q. You may tell the jury whether or not you had occasion to go to her place on or about the 19th day of December, 1908? A. I did. Q. Who did you find in possession? A. Mrs. Carroll. Q. Who, if anyone, else did you find there? A. Barbara Leigh, Louise Voss, or Aldrich, whatever her name is, and Jennie McElliott, Pearl Snowden, and a little later Beulah Edwards came. And there was— I have forgotten the gentleman's name, there was one gentleman in room 1, and a couple of gentlemen that I didn't keep their names that were in another room. And Bill Williams came up presently. Q. Bill have a room there at that time? A. He did. Q. What was the number of the room? A. I think it was 5, I'm not sure about the number. Q. You may tell the jury whether or not there was anyone else occupying the same room at that time with Mr. Williams? A. There was. Q. Who was it? A. Louise Voss or Aldrich. Q. You may state, Mr. Chambers, if you know, the reputation in the community in which the inhabitants of that building reside and have resided as to— that is, the general reputation as to being lewd and lascivious in character? By Mr. Forrest: Objected to, witness not competent to testify. By the Court: Sustained. Q. Mr. Chambers, how long have you known— how long have you lived in El Reno? A. Pretty near two years. Q. How long have you known Beulah Edwards? A. About the same length of time? Q. How long have you known Barbara Leigh? A. Eight or nine months. Q. How long have you known Louise Voss or Aldrich, as her name may be? By Forrest: Objected to. Q. Are you acquainted with their general reputation in the community in which they live, do live at this time as to being of lewd and lascivious character? By Forrest: Objected to as immaterial. By

Court: Overruled. Exceptions. A. I think I am. Q. Is that reputation good or bad? A. Bad."

This witness further testified, over the objection of the defendant, that the general reputation of the place kept by the defendant, in the community in which it was located, as to being a place where lewd and lascivious persons of both sexes congregated for the purpose of unlawful co-habitation or sexual intercourse, was bad.

H. H. Mayfield testified as follows:

"Q. State your name to the jury. A. H. H. Mayfield. Q. Mr. Mayfield what official position if any were you holding during the month of December, 1908? A. Deputy sheriff. Q. Were you acquainted at that time with the building occupied by this defendant here at that time? A. Yes, sir. Q. You may state where that building is— where it is located— was located at that time during— on or about the 10th day of December, 1908? A. She is in the second story of what is known as Gunn building, located on Rock Island Ave., second door north from Woodson street. Go up stairs over the Waring Seed Store. Q. She occupied the upstairs, the upper portion of the building? A. Yes, sir. Q. You may state whether or not you had occasion to visit that place on or about the 19th of December, 1908? A. Yes, sir. Q. Who did you go there with? A. Mr. Chambers and Mr. Earnest, I believe. Q. Who did you find in charge of the building? A. Josephine Carroll. Q. Who, if anyone else, was there? A. There was Louise Voss, Barbara Leigh, Pearl Snowden, and the McElliott girl, and Pearl Snowden and a girl by the name of McElliott, I believe that is her name. That is the name she gave. Q. Ask you to state if Beulah Edwards was there? A. Yes, sir. Q. How many rooms was in that rooming house? A. Eight or nine—some where along there. Q. You say that these six girls whom you have named were there at that time? A. Yes, sir. Q. You know of anyone else that was there? A. There was some drummer up there, and then Bill Williams came up there after we were there awhile. Q. Is Bill Williams— you are acquainted with Billy Williams. A. Yes, sir. Q. Is he a married or single man? A. A single man. Q. Did Will have a room up there? A. He did. Q. Was he going to his room? A. He said he was. Q. Did you find any of his things up there? A. Yes, sir. Q. What did you find? A. His trunk and his clothes and a suit case. Q. In what room? A. I ain't sure, but I think

No. 4. Q. You may state if you know whether there was anybody else occupying that room or not? A. Louise Voss was occupying it. Q. Find any of her paraphernalia in there? A. Yes, sir. Q. What did you find of her's in there? A. Trunk and her clothes. Q. How long have you known Beulah Edwards? A. Something like six months or nine months, something like that. Q. How long have you known Barbara Leigh? A. First time I saw her was about a month before this, something like that, perhaps two or three months. Q. How long have you known of her? A. Well, that is all I have known of her. Q. How long have you known of Louise Voss? A. Known of her about two or three years. Q. Are you acquainted with those girls' reputation in the community in which they live as to being of lewd and lascivious character? A. Yes, sir. Q. Is that reputation good or bad? A. Bad. Q. How long have you known of this rooming house run by Josephine Carroll? A. Along about the latter part of November or the first of December, 1908. Q. Are you acquainted with the general reputation of the inmates of the house and those who visit there as to being— I mean of both sexes, as to being of lewd and lascivious character? A. Yes, sir. Q. Reputation good or bad? A. Bad."

Robert Aycock testified:

"I went up there, went to the door, rapped on the door there, and there was another lady came to the door and I asked whether the lady of the house was in and she called her out and this lady came, and I asked if she had any rooms to rent and she said she did, and I asked her what the price of the rooms was, and she said 50c a night. And I asked her how they were furnished. And she said 'just furnished rooms,' and I said 'is that all,' and she said 'No, you can have a girl if you want her.' She said, 'Do you want a girl?' I told her if I got a room I did, like that, but that wasn't what I was after. And so she wanted to know what it was that I wanted and I told her I wanted some whiskey, and she said she didn't have any whiskey at all, and she said 'You want me to call that girl out for you?' I told her 'No,' and she says two or three times should she call the girl out for me, and I told her no, she need not, that I wanted some whiskey, and she said she didn't have any whiskey. Q. About when was that? A. That was some where— must have been in October."

Some courts hold that in cases of this kind the reputation of the house kept and of its inmates is not admissible in evidence,

but upon reason and the weight of authority we cannot agree with this conclusion. The general rule is that hearsay evidence is incompetent to establish any specific fact which is in its nature susceptible of being proven by witnesses who speak from their own knowledge. None save the most abandoned and untrustworthy could be induced, voluntarily, to testify to facts within their own knowledge, which would sustain the charge in this case. In its nature the fact at issue in this case is not susceptible of proof by the testimony of witnesses of their own knowledge. Proof by general reputation is not only necessary, but it is far more reliable and satisfactory than the evidence of witnesses who would testify to their own discredit and shame. It is inconceivable that any house would acquire the general reputation in its neighborhood of being kept for the purpose of prostitution if in fact it was not kept for that purpose. The general reputation of a house in its neighborhood is the result of the conduct of the person who keeps it, and there is no injustice in holding such person responsible for this reputation. In fact in cases of this kind the reputation of the house is its advertisement, and is a source of profit to its keeper. We fully agree with Mr. Wigmore, when in speaking of this class of cases, he says:

"Having regard to the circumstances from which such a reputation arises, and the difficulty of obtaining other evidence in the ordinary way from unimpeachable witnesses, it seems unquestionable that reputation should be admitted as trustworthy and necessary evidence." (Vol. 2, page 1621, Wigmore on Evidence.)

But be this as it may, our statute settles this question against the contention of appellant. Wilson's Oklahoma Statutes, sec. 2301, is as follows:

"Every person who keeps any bawdy house, house of ill fame, of assignation or of prostitution, or any other house or place for persons to visit for unlawful sexual intercourse, or for any other lewd, obscene or indecent purpose, is guilty of a misdemeanor."

From this it is seen that the "ill fame" of the house is an element of the offense. Further discussion or citation of authority is unnecessary. The evidence objected to was properly admitted

by the trial court and fully sustains the verdict of the jury and the judgment of the court.

The judgment of the trial court is in all things affirmed.

DOYLE and RICHARDSON, Judges, concur.