## MRS. B. PUTMAN v. STATE.

No. A-1583.   Opinion Filed June 7, 1913.

(132 Pac. 916.)

1. **DISORDERLY HOUSE—Evidence of Reputation.** In prosecutions for keeping a house of ill fame, it is competent to introduce evidence of the general reputation of the house in the neighborhood in which it is situated as to its being a place where lewd and lascivious persons of both sexes congregate for the purpose of unlawful cohabitation or sexual intercourse. But such evidence alone will not support a verdict. It must be corroborated by some other fact or circumstance tending to prove the character of the house.

2. **SAME—Prosecution—Sufficiency of Evidence.** For testimony which supports a verdict of guilty of keeping a house in which lewd and lascivous persons of both sexes congregate for the purpose of unlawful cohabitation, see opinion.

3. **SAME—"Bawdyhouse."** The terms "bawdyhouse" and "disorderly house" are used interchangeably and mean the same thing.

(Syllabus by the Court.)

*Appeal from County Court, Garfield County;*
*Winfield Scott, Judge.*

Mrs. B. Putman was convicted of maintaining a bawdy-house, and she appeals. Affirmed.

John F. Burford testified for the state that he, in company with H. L. Reynolds, visited the house kept by appellant in the city of Enid on the 2d day of July, 1911, about a quarter after 9 o'clock at night. Witness then testified as follows:

"A. Well, we walked up the stairway into this building and at the head of the stairs this lady came and met us. She met us at the head of the stairs. I asked her if she was the proprietor, and she said, 'Yes.' I asked her if she knew of any rooming house for sale, and she said 'Yes,' and mentioned among them the Grand avenue and one right next to the post office. I believe that I will have to look at my notes in order to remember the name of it; anyhow, she mentioned the two, and then I asked her as to her house, if she would like to sell it, and she said, 'No'; and I asked her if she was doing well with it, and she said, 'Yes.' I asked her, 'How do you manage to make it pay? Do you keep any girls?' She said, 'Yes.' She pointed back to the front end of the hallway and invited us to go back. I says, 'They seem to have company; I see a gentleman back there, a man or somebody.' She said, 'That's all right; that doesn't make any difference; go back.' I walked back and had a seat, and so did Mr. Reynolds, and this gentleman that was sitting there got up and went into the room just across the way, on the southeast corner; it was the same room I had seen this woman go into. Q. What woman are you speaking about? A. I mean the one here. We sat and talked for some little bit. There was a small girl that I was talking to, and the girl that Mr. Reynolds was talking to was rather small. While we were talking, I overheard the girl that was talking to Mr. Reynolds insisting on him going to the room with her and heard him ask her how much she wanted to charge him, and she said, '$3,' and they were jollying about the price; that is about all I heard of their conversation. Q. Well, what happened to them? A. Well, after a little they got up and left and went into the second room from the front on the north side, near the head of the stairway. Q. With reference to the room on the southeast side in which Mrs. Putman entered how far was this room in which they entered? A. Well, it was diagonally

across the hall from where Mr. Reynolds and this girl entered and was facing in the direction of that, and I should judge about— I should judge, going diagonally, it must have been pretty nearly the width of two ordinary rooms or something like that, I would judge. Q. What was the condition of her door with reference as to whether or not it was open at this time? A. I noticed— By Mr. Glasser: If the court please, the defendant objects to that question for the reason that it is a trifle leading and, suggestive, incompetent, irrelevant, and immaterial. By the Court: The question is leading. Q. What was the condition of that door? By Mr. Glasser: If the court please, I object to the form of the question, unless he states the condition with reference to what. Q. What was the condition of that door with reference to whether or not it was open or shut? By Mr. Glasser: The defendant objects to the question put in that form for the reason it is leading. By the Court: The objection is overruled. By Mr. Glasser: To which ruling defendant excepts. Q. State, if you know? A. The door was standing open every time I saw it, but at the time he went in there I wasn't sitting where I could see. Q. All right. Go ahead and tell what next happened. A. They stayed in the room, I suppose, for 20 or 30 minutes and came out, and Mr. Reynolds came back and sat down, and the girl came out directly with either a slop bucket, or something with water in it, or something like that. During the time they were away, this little girl insisted on my going to room with her. Before they came back, the little girl went back up the hallway, and there was a girl and a man that entered the northeast room; that door was open all the while I was there. Q. Do you remember in what position they were when you saw them? A. I wouldn't say that the man was sitting down or standing up. I rather think that he was standing up dressing and in his shirt sleeves; anyhow, he passed out of the room and I wouldn't say where he went; anyhow, this little girl walked down the hallway while Mr. Reynolds was in the room with the other girl, and she said to me, 'Why don't you go on and spend some money with the little girl?' I says, 'Well, I am not feeling very well this evening,' or something like that; I don't know just what it was that I said. Now, I believe that that is about all that I do know about it. Q. Did you see that girl again who was in company with a strange man who was dressing and who departed? Did you see her later, after he departed? A. After

the man departed? Q. Yes, after he left. A Well, that is when I was sitting there talking to her and while the little girl was gone, she asked me why I didn't take the girl and spend some money with her; it was this little girl; she was sitting in a chair, as I remember, just inside the door; the woman was sitting, and I think the man was standing when we came up. Q. Where did she go? Where did the girl go? A. The little girl— I don't know other than she went— Let me see. I was trying to get at the direction. Q. Do you know where she went? A. Yes, sir; I do. Q. Where did she go? A. She went west; she went in the opposite direction from the front, down the hallway; I don't know where she went. Q. Was she the girl who was in the room with the strange man? A. The little girl was not; this larger girl was; the one that I talked to while the little girl was gone was the girl with the man; she was sitting inside the door, and when the man left, and this little girl walked up the hallway, she talked to me. Q. What did she say to you? 'A. She said to me, among other things, 'Why don't you take the little girl and spend some money ?' Q. Who said that? A. This big girl that was in this room with this man. Q. Who had left? A. Yes, sir. By Mr. Glasser: I think that this examination is as leading as it can be; this witness can tell what is necessary. By the Court: Tell what happened there and relate the conversation as near as you can. A. In our conversation, she remarked she was from. Oklahoma City. Q. Did you have any further conversation? A. Yes, sir; we did. Q. Can you remember what it was? A. I can; yes, sir. Q. What was that conversation? A. I says, 'Well, how do you find business up here to, or how is business here compared to what it is in Oklahoma City? Are you making much money up here? She says, 'I made something over $60 this past month.' Q. This happened in what county? A. It happened in Garfield county. Q. In what state did it happen? A. It happened in the state of Oklahoma. Q. Do you remember the date? A. I do remember it, yes. Q. What was the date? A. It was on the 2d day of July. Q. Of what year was it? A. Of the year of .1911. Q. About what time that day was it? A. It was about 9 :15 o'clock in the afternoon."

H. L. Reynolds testified for the state as follows:

"A. Mr. Burford and I went up the stairs which went through the center of the house, and at the head of the stairs we met the defendant, and Mr. Burford engaged her in conver-

sation. I heard Mr. Burford ask her if she knew of any rooming houses for sale, and she answered that there were one or two, she thought; she named several, I think. Q. Do you remember what next was said? A. Yes, I remember about all the conversation that took place at that time. Q. What was the next thing that was said? A. He asked her if her rooming house was for sale. Q. Did she reply to this? A. She did. Q. What did she say in reply to that? A. She said, 'No'; that she was doing a pretty good business. Q. What was the next that was said between them? A. Mr. Burford asked her if she depended upon her rooms for keeping up her house, or whether she kept some girls; she said, 'Yes'; she had three girls, and she asked us if we wouldn't go back and talk with them. We went to the front of the building, and Mr. Burford, I think, was in the lead; there were two girls sitting there, and another man, and the man and Mrs. Putman went into the room to the south of the front there and left Mr. Burford and I there with these two girls. In a few minutes another girl came out from the north room in front and sat down, and there were the three of us there and Mr. Burford, and I was talking to one girl there and Mr. Burford was talking to the other two; I don't know just what his conversation was with them; I was pretty busy myself, but some time during my conversation with the girl that I was talking to we were talking about Oklahoma City and different places and things in that place, and she asked me if I wouldn't go to bed with her and go to a room with her, and I asked her how much she wanted. We finally agreed upon the price. Q. What was that price you agreed on? A. It was $2; we went to the room; this room was situated just west of the north room on the east side, and we used the second room on the north side from this end of the building. Q. Did you both go in the room together? A. Yes, sir; we did. Q. What did you do while you two were in there? A. While we were in there we had sexual intercourse and we came out; Mr. Burford and I left the building. Q. What took place in that room? A. Why, we had sexual intercourse. Q. Do you remember any conversation which she had with you at that time? A. I couldn't state just the conversation; I think she intimated that she had seen me in Oklahoma City, and I may have stated that I had been there. Q. She said she thought she had seen you there? A. She said, anyhow, that she thought she had seen me down there. As we were going out of the door, she said,

'You are not a gentleman if you turn me in.' Q. Where did you go next? A. Well, do you mean after I left the room? Do you mean where I went next after I left the room? Q. Yes. Where did you next go after leaving the room? A. Well, I entered the hall and called for Mr. Burford. Q. Then what did you do? A. We then left the building. Q. This happened in what county, Mr. Reynolds? A. It happened in Garfield county. Q. In what state did it happen? A. In the state of Oklahoma. Q. On what date did it take place? A. The date was the 2d day of July. Q. Now, about what time did it happen? A. It happened about 9:15 o'clock p. m."

P. Chaney testified for the state that he resided in the city of Enid for 18 years, and that he was acquainted with the house kept by appellant, and that it had the general reputation in that community of being a place where lewd and lascivious persons of both sexes congregated for the purpose of unlawful cohabitation or sexual intercourse. To this counsel for appellant objected upon the ground that the evidence was incompetent, irrelevant, and immaterial, and for the further reason that a house cannot have a reputation, which objection was by the court overruled, to which action of the court appellant excepted.

W. J. Roberts testified for the state that he had lived in the city of Enid between 13 and 14 years and knew the house kept by appellant and that it had the general reputation in that community of being a house where lewd and lascivious persons of both sexes congregated for unlawful cohabitation or sexual intercourse, to which evidence appellant objected upon the ground that it was incompetent, irrelevant, and immaterial, and for the further reason that a house cannot have a reputation, which objection was overruled by the court, to which action of the court counsel for appellant excepted. The state here rested.

Appellant testified in her own behalf that she was keeper of the house in question and had kept said house for about a year, and that on the night when the house was visited by Burford and Reynolds there were only three girls there. One was named Clara Brown, who said she was from Oklahoma City; the other was a Mrs. Farris, who claimed to live in El

Reno, and who said she was in Enid for the purpose of visiting her husband, who was also in the house at that time; and the other girl was named Maud, who had been in the employ of appellant several months as a chambermaid; that Clara Brown had previously been at the house of appellant two weeks and had come back that way on her way from Oklahoma City to Joplin, Mo.; that appellant was a married woman, who was divorced from her husband, and that she had been operating and managing rooming houses in the city of Enid for eight years; that, if any of the girls stopping at the house of appellant had ever been guilty of immoral practices there, she did not know it. Appellant did not deny the conversation of the witnesses Burford and Reynolds, as testified to by them. Appellant did not offer any evidence as to the reputation of the house or as to the character or business of the persons who patronized it.

*Harry O. Glasser,* for appellant.
*Smith C. Matson* and *Jos. L. Hull,* Asst. Attys. Gen., for the State.

FURMAN, J. Upon the authority of *Carroll v. State,* 4 Okla. Cr. 242, 111 Pac. 1021, and *Smith v. State,* 6 Okla. Cr. 380, 118 Pac. 1003, the judgment of conviction in this case should be affirmed without a written opinion. But as a matter of respect for the earnestness and zeal which counsel for appellant has manifested in this cause, and the courtesy and ability with which he has presented his contention before the court, we will treat the questions involved as though they were of first impression.

The arguments advanced by counsel for appellant may be grouped under the general objection that the verdict of the jury is contrary to the law and the evidence. The legal question presented in the language of counsel for appellant is "that a house itself cannot have a reputation," and that therefore the court erred in admitting the testimony that the house kept by

appellant had the general reputation in that community of being a house where lewd and lascivious persons of both sexes congregated for unlawful cohabitation or sexual intercourse. We concede that the position assumed by counsel for appellant is plausible upon its face, and that it is supported by respectable authorities. Upon an examination it will be found that the cases supporting this contention are all from states in which the common-law doctrine of a strict construction of penal laws is in force, which compels a very narrow view of such matters. But this doctrine is not in force in Oklahoma. On the contrary, it is repealed by the express language of our statute which requires that all statutes shall "be liberally construed with a view to effect their objects and to promote justice." Rev. Laws, 1909, sec. 2948. It was in obedience to this statute that in the case of *Buchanan v. State,* 4 Okla. Cr. 645, 112 Pac. 32, 36 L. R. A. (N. S.) 83, this court disregarded the great weight of common-law authorities upon the question of construing statutes. Under this statute we have repeatedly held that the *corpus delicti* may be proven by circumstantial evidence. See *George v. United States,* 1 Okla. Cr. 307, 97 Pac. 1052, 100 Pac. 46; *Nettie V. Brown v. State, ante,* 132 Pac. 359, decided at this term.

In the case of *Stewart v. State,* 4 Okla. Cr. 564, 109 Pac. 243, 32 L. R. A. (N. S.) 505, and in the case of *State v. W. H. Coyle et al.,* 7 Okla. Cr. 50, 122 Pac. 243, and in the same case on motion for rehearing, 8 Okla. Cr. 686, 130 Pac. 316, this court held that an offense may be created by defining it by a particular description of the act or acts constituting it, or by defining it as any act which produces, or is reasonably calculated to produce, certain defined or described results. In fact, without a single exception, this court has always held that the penal laws of this state are to be given that reasonable and liberal construction which will enable them to reach and destroy the evils at which they are aimed. For these reasons the authorities cited by counsel for appellant are not applicable to

the question now before us. But, even if they were based upon statutes in all respects similar to ours, we would not feel dis-posed to follow them, unless we understood and approved the principles upon which they are ·based. In the early case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, this court said "Precedents should be weighed, and not counted," and "a multiplicity of errors does not make right that which is predicated upon false premises, and which was therefore wrong at its inception." We then declared that we would not follow any precedents, it mattered not by what court estab-lished, unless they met with our approval, as a matter of prin-ciple. The habit of blindly following and parrot-like repeating precedents without reference to the principles upon which they are based is the cause of most of. the confusion and conflicts which now exist among the decisions of the American appellate courts. One practical illustration is worth a thousand theories. Experience is the acid test of any theory.

A few illustrations will demonstrate the fallacy in the rea-soning of the cases relied upon by counsel for appellant.. What is known as the social evil is the greatest danger which now threatens the integrity of society and the purity of the home. It presents itself in many different forms. At first the evil was local in its character and was confined to ordinary bawdy-houses kept by individual proprietors. Then the rule contended for by counsel for appellant might have been sufficient. But in the development of crime it has gone far beyond this. In the underworld to-day it is recognized as a regular matter of commerce, and trusts are organized for its exploitation, and immense sums of money are made thereby. Thus it has grown to become the infamy of the infamous. The greatest states in the Union and the Congress of the United States have been compelled . recently to pass stringent legislation against the spread of this vice and its attending enormity, the white slave trade. The old doctrine of the common law that the reputation of a house could not be proved will not begin to meet and  •

check the evil as it presents itself to-day. It is a fact so well known in all large cities that courts take judicial knowledge of it that houses of ill fame are established and kept where lewd persons of either sex are permitted to remain. These establishments are exclusive in their character and present an air of gentility and imminent respectability. They are patronized only by persons of both sexes who live double lives and against whose virtue nothing is publicly known. Innocent and inexperienced girls are inveigled into such establishments, and their ruin is accomplished. Men and women of supposed respectability and virtue, and against whose reputation no legal evidence could be obtained, visit these houses for the purpose of indulging in unlawful sexual intercourse. This is really the most insidious and dangerous form in which the social evil presents itself. It is more dangerous to a community than a pesthouse of leprosy would be. If the general reputation of such a house were not admissible in evidence against its keeper, it would be almost impossible for the state to secure a conviction, and a community in which it was established would be unable to relieve itself of this airhole of hell and recruiting office for perdition. The men who patronize such houses generally occupy respectable positions in society. The women who accompany them are generally so heavily veiled as to make recognition impossible; but, if recognized, many, if not all, of them will be found to occupy respectable positions in society. So the state would be forced to rely largely upon the reputation of such a house to support a prosecution. The practical effect of the position of counsel for appellant would be to grant immunity to the keepers of such houses, it matters not where located. But again, if we recognize the doctrine contended for by counsel for appellant, it would place it in the power of those who control these houses to organize a vice trust in Oklahoma and by changing the women kept in ordinary bawdyhouses from one town to another and not allowing them to remain in one place long enough for their true character

to become generally known, and thereby the evidence which the authorities relied upon by counsel for appellant recognize as proper could not be obtained by the state. Again, in the case of *Nelson v. Territory,* 5 Okla. 512, 49 Pac. 920, relied upon by counsel for appellant, it is expressly stated:

"It is competent for the prosecution to show that the house is resorted to by people of both sexes who are reputed to be of lewd and lascivious character. From evidence of the general reputation of the inmates and persons who resort thereto as being lewd and lacivious characters, the law will infer that such characters resort thereto for lewd and immoral purposes."

If the reputation of those who resort to the house may be proven, why may not the reputation of the house itself be proven? If this inference can be drawn from the character of the persons who resort to such houses, why can it not be drawn from the character of the house to which they resort? If children go to a building which has the reputation of being a schoolhouse, does not this raise the inference that they are going there for the purpose of being educated? If entire strangers are seen to enter a house on Sunday which has the general reputation of being a church, would this not raise the inference that they were going there for the purpose of engaging in religious services? Do ladies go to drug stores to purchase millinery, or go to millinery stores to purchase drugs? As a matter of principle, we are unable to recognize the doctrine established in the authorities relied upon by counsel for appellant. But we are gravely told that the character of a house of ill fame can be established by proving that the inmates have been fined in the police courts as prostitutes. In police courts the fact that a woman resides in or resorts to a house of ill fame is conclusive of the character of the woman. According to the position of counsel for appellant, while the reputation of a house may not be admissible in the first instance, yet, after it has received the seal of approval of the police court, it then becomes competent in a court of record. If this

court refuses to blindly follow the decisions of the appellate courts of other states, we would instantly assume a ridiculous position if we allowed ourselves to be bound by the decisions of a police court. So as a matter of principle we submit the cases relied upon by counsel for appellant will not stand the test of reason.

But we are told that the character of a defendant is never admissible in evidence unless he first raises this issue. There are two conclusive answers to be made to this objection: First. The evidence in question does not go to the personal character of the defendant, but goes alone to the reputation of the house she is charged with keeping, and this is the essence of the crime alleged, without reference to her personal character. It is true that the character of a defendant cannot be attacked, as a general rule of law, unless it is first placed in issue by the defendant; but like all other general rules this has its exceptions.

Mr. Wigmore, in the second volume of his work on Evidence, sec. 1621, under the head of "Keeping a House of Ill Fame, or a Disorderly House," says:

"Having regard to the circumstances from which such a reputation arises, and the difficulty in obtaining other evidence in the ordinary way from unimpeachable witnesses, it seems unquestionable that reputation should be admitted as trustworthy and necessary evidence."

We find the following in the Encyclopedia of Evidence, vol. 4, p. 725:

"Whether reputation is admissible to prove that a house is disorderly is a question concerning which the cases are conflicting. But the weight of authority seems to be that evidence of reputation is admissible to prove the character of a house, and particular acts of lewdness or prostitution need not be be proved. California: *Demartini v. Anderson,* 127 Cal. 33, 59 Pac. 207. Connecticut: *State v. Main,* 31 Conn. 572; *State v. Morgan,* 40 Conn. 46; *Cadwell v. State,* 17 Conn. 467. Dakota: *Territory v. Stone,* 2 Dak. 155, 4 N. W. 697; *Territory v. Chartrand,* 1 Dak. 379, 46 N. W. 583. Florida: *King v. State,* 17 Fla. 183, Georgia; *Hogan v. State,* 76

Ga. 82. Idaho: *People v. Buchanan,* 1 Idaho, 681; *Territory v. Bowen,* 2 Idaho, 640, 23 Pac. 82. Indiana: *Betts v. State,* 93 Ind. 375; *Whitlock v. State,* 4 Ind. App. 432, 30 N. E. 934; *Graeter v. State,* 105 Ind. 271, 4 N. E. 461. Massachusetts: *Commonwealth v. Kimball,* 7 Gray, 328; *Commonwealth v. Cardoze,* 119 Mass, 210. Michigan: *O'Brien v. People,* 28 Mich. 213. Minnesota: *State v. Bresland,* 59 Minn. 281, 61 N. W. 450; *State v. Reckards,* 21 Minn. 47; *State v. Smith,* 29 Minn. 193, 12 N. W. 524. Montana: *State v. Hendricks,* 15 Mont. 194, 93 Pac. 93, 48 Am. St. Rep. 666. Nebraska: *Drake v. State,* 14 Neb. 535, 17 N. W. 117. New Jersey; *Jannone v. State* (N. J.) 45 Atl. 1032. Rhode Island: *State v. Hull,* 18 R. I. 207, 26 Atl. 191, 20 L. R. A. 609; *State v. Towler,* 13 R. I. 661. South Carolina: *State v. McDowell,* Dud. 346. Texas: *Sara v. State,* 22 Tex. App. 639, 3 S. W. 339; *Harkey v. State,* 33 Tex. Cr. R. 100, 25 S. W. 291, 47 Am. St. Rep. 19; *Golden v. State,* 34 Tex. Cr. R. 143, 29 S. W. 779; *Cook v. State,* 22 Tex. App. 511, 3 S. W. 749; *Sylvester v. State,* 42 Tex. 496; *Morris v. State,* 38 Tex. 604; *Allen v. State,* 15 Tex. App. 320; *Stone v. State,* 22 Tex. App. 185, 2 S. W. 585. Wisconsin: *State v. Brunell,* 29 Wis. 435."

On the same subject under the head of bawdyhouses, on page 503 in volume 14 of Cyc., we find the following:

"Under common-law principles it would seem that evidence of the general reputation of a house would be inadmissible upon the issue of whether it is a bawdyhouse, and so quite a number of authorities hold; but very many authorities hold that the reputation of the house is admissible."

The terms "bawdyhouse" and "disorderly house" are used interchangeably, and mean the same thing.

In the case of *State v. Main,* 31 Conn. 572, that court said:

"(3) Evidence of the reputation of the house prior to the discontinuance of the first prosecution was properly received. In the case of *Cadwell v. State,* 17 Conn. 467, it was held that evidence of the reputation of the house prior to the commission of the offense as charged in the information, and even prior to the enactment of the statute on which

that prosecution was founded, was admissible to prove its reputation at the time of the offense committed, because, as remarked by Judge Storrs, evidence of the reputation of the house previous to a particular time fairly conduced to show its reputation afterwards.' "

In the case of *Territory v. Chartrand,* 1 Dak. 383, 46 N. W. 584, the court said:

"The first error assigned is this: That the court erred in admitting evidence to show the general reputation of character of the house kept by defendant. In disposing of this question, it is understood, as the fact appears, that the defendant was the proprietor or keeper of the house in question. That fact being established, both upon principle and authority, we think the testimony competent. Acts of adultery, acts of lewdness, acts of prostitution, are not acts to which the perpetrators give publicity or notoriety. Shameless and degraded indeed must this class of criminals be who will not by all the means within their power conceal and hide their shame. Nor is it a crime which ordinarily will be attended with such circumstances as is calculated to lead to exposure and detection. No immediate death or fatal shot will invite public attention to criminals. From the necessity of the case, therefore, we are unanimously of the opinion that this testimony was properly received."

In the case of *King v. State,* 17 Fla. 191, the court said:

"We are aware that the courts of some of the states have held that evidence of reputation of the house as a house of ill fame is not admissible, but believe the better rule to be that adopted in Connecticut. In that state the language of the statute is precisely similar to our own, 'keeping a house of ill fame resorted to for the purpose of prostitution or lewdness,' and the courts of that state have held that, by force of these particular words, it is both permissible and necessary to prove the reputation of the house."

In the case of *Betts v. State,* 93 Ind. 376, that court said:

"Bouvier, in his Law Dictionary, defines a 'bawdyhouse' as being 'a house of ill fame, kept for the resort and unlawful commerce of lewd people of both sexes'; and other law dictionaries and lawwriters give substantially the same

definition. Accepting this definition as sufficient, it has been held, and we have no doubt correctly, that the terms 'bawdyhouse' and 'house of ill fame' are synonymous. *State v. Boardman,* 64 Me. 523. Webster's Dictionary, in giving the meaning of 'bawdyhouse,' treats the term 'house of ill fame, as its synonym. A. 'house of ill fame' may therefore be said to be a 'bawdyhouse kept for the resort and unlawful commerce of lewd people of both sexes.' The words 'house of ill fame' has consequently a well-defined legal, as well as generally accepted meaning. We see no objection to the sufficiency of the indictment. At the trial one Miller was examined as a witness for the state. He stated that he had been acquainted with the defendants since about the 1st of April, 1882, also with the house in which they had lived, as well as the reputation of that house during that period. Over the objection of the defendants, he was permitted to further state that 'the general reputation of that house was that it was a house of ill fame, a house of prostitution,' and complaint is made that this evidence ought to have been excluded. The authorities are not entirely in accord upon the admissibility of such evidence in a case like this, but we think the decided weight of authority is in favor of its admissibility. Moore's Criminal Law states the rule to be that 'a house of ill fame may be proved to be such by direct evidence, or by reputation, or by circumstances, as that the inmates were reputed to be prostitutes, or that prostitutes and libertines frequented it, or that lewdness took place therein,' and numerous authorities are cited in support of these several propositions. See Moore, Crim. L. sec. 1072, and notes. *State v. Brunell,* 29 Wis. 435, one of the cases cited by Moore, holds that, in a prosecution for keeping a house of ill fame, the state must first prove that the person charged kept the house in question; that the general reputation of the house, and of its frequenters and the defendant, may then be shown, and, if these satisfy the jury that the house was kept and resorted to for the purposes of prostitution and lewdness, they may so find without proof of particular acts of prostitution or lewdness occurring in the house. But that proof that the house was reputed to be a house of ill fame, or that its frequenters and the defendant were persons of bad character for chastity and virtue, is not conclusive of the defendant's guilt. Such facts constitute

only circumstances proper to be considered by the jury. That case impresses us as one that may be safely followed in this state, and fully sustains the admissibility of the evidence of Miller, objected to as above."

In the case of *State v. McDowell,* Dud. (S. C.) 346, the Supreme Court of South Carolina, in an opinion by Chief Justice O'Neal, said:

"When it is shown that their houses were notorious (that is, known to the whole community) as common bawdy-houses, it is the same thing as if it was proved that over the door of each house was written in the abominable law word, 'bawdy within.' Look to the reason why the law punishes the offense. It is because such houses may draw together dissolute and disorderly persons, to the danger of the public peace, and may corrupt the manners of both sexes. Is not a house, notorious as a bawdyhouse, the very thing to attract dissolute and disorderly persons, and is it not the very thing to corrupt the manners of both sexes? To say that there is any danger of a virtuous woman being convicted on such testimony is utterly absurd. She cannot even be suspected until she has lost her character, and she cannot be convicted until she occupies a position furnishing flagrant proof. But, if such a charge should ever be made against a virtuous woman, her character will be her shield; and in her vindication she may examine into the foundation and truth of every particular on which such a charge may be made. I think, too, a decent regard to good morals should always be had in the requisition and adduction of evidence in a court of justice. Every corrupting fact which can be supplied by general proof should be excluded. The general proof here is just as satisfactory as the most direct proof can be. Why should more be required? The law does not require it, for no such rule of evidence exists. The best evidence which the nature of the case admits of is an old and familiar rule that has been complied with here; and we have the proof of the truth of the old saying that 'what everybody says must be true,' in the admission of the zealous counsel for the defendants that he had not a doubt of their guilt. And, in a case in which character is its very gist, I am willing to make that which everybody

says the evidence on which a jury may, if they choose, convict defendants for keeping a bawdyhouse."

We might continue to quote authorities to the same effect indefinitely. These are ample to show that we are not without support in the matter of precedents in the position which we have assumed. The rule for which we contend is in strict harmony with the fundamental principles of justice. If a house has the general reputation of being a bawdyhouse, such reputation must be known to its keeper and can only be gained and maintained on account of the conduct of the persons who resort to it. It is inconceivable that a house kept for proper purposes should ever gain the general reputation of being a bawdyhouse. The reputation of the house is the advertisement of its keeper. It draws customers and is a source of revenue. There is and can be no injustice in holding the keeper of a house responsible for its general reputation when that reputation is backed up by any evidence which tends to show that it is well founded. It was for these reasons that in the case of *Carroll v. State*, 4 Okla. Cr. 242, 111 Pac. 1021, and the case of *Smith v. State*, 6 Okla. Cr. 380, 118 Pac. 1003, this court held that in a prosecution for keeping a bawdyhouse it is competent for the state to introduce evidence of the general reputation of the house in the community in which it is situated as to its being a place where lewd and lascivious persons of both sexes congregated for the purpose of unlawful cohabitation or sexual intercourse. But it will be observed that this court has never stated that such evidence alone was sufficient to sustain a conviction. We are of the opinion that those cases which so hold go too far. We think that, while this evidence is admissible, yet standing alone and by itself it is not sufficient to sustain a conviction. Evidence of recent possession of stolen property is always admissible in a prosecution for theft, but this evidence alone will not sustain a conviction, but must be considered in connection with all of the other facts and circumstances in the case. The

danger of convicting a defendant alone upon the reputation of a house is clearly pointed out in an opinion by Presiding Judge Armstrong, handed down at the present term of the court, in which the conviction was reversed because there was no corroborating evidence. But in Patterson's case, *post,* 132 Pac. 693, the admissibility of evidence of the reputation of the house was recognized and affirmed.

We have discussed this question fully because counsel for appellant so strongly insisted that such evidence was not admissible for any purpose. In this case there is no question that the appellant kept the house. In fact, it was admitted.

In the light of the testimony of the reputation of the house, in connection with the other testimony in the case, the jury were fully warranted in finding the appellant guilty.

The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.