# ROY BATES v. STATE.

No. A-6600.   Opinion Filed May 25, 1929.
(277 Pac. 676.)

Madden & Hubbell, for plaintiff in error.

Edwin Dabney, Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted on a charge of keeping and maintaining a bawdyhouse and a place for persons to visit for lewd, obscene, and indecent purposes at his home near Walters, Cotton county, Oklahoma, and his punishment left to the court.   The court imposed a sentence on the defendant of a fine of $250.   Motion for new trial was filed, considered, overruled, and the case appealed to this court.

The state in order to maintain the allegations in the information called S. E. Cook, who in substance testified he was deputy sheriff; that he went with Sheriff Hooper to the home of Roy Bates at night; we drove up in the yard; the first thing he remembers was some boys and girls came out of the house, some of them were cursing; it sounded like there was a fight; one of the girls said something about not going back with the son of a bitch, but he did not see the defendant at that time; they were dancing in defendant's home; the girl was talking to a boy; I did not see either of the parties; I did not understand all the conversation; two girls came out of the house fighting; the boys did not try to separate the girls; we separated them; I went in the house and defendant was in the room dancing; there was probably 65 or 70 people at the dance; I had been to defendant's home about a year and a half previous to this time. Witness was then asked by the county attorney if he ever had a conversation with the defendant about the conduct of his wife, which was objected to by the defendant's attorney as being incompetent, irrelevant, and immaterial. The objection was overruled, and defendant excepted. Witness then answered: "Yes, the sheriff did in my presence." This was about a month or two before we went to the house while the dance was going on; the sheriff told the defendant in my presence there had been complaint about the place he was conducting over there; the defendant told the sheriff there was nothing wrong going on over there; the sheriff then asked defendant what did he mean by having his wife going around with other men, and defendant said that he did not object, and that she was doing nothing wrong. Witness was then asked by the county attorney as to the reputation of defendant's home being a place where persons visit for lewd, obscene, and indecent purposes. De-

fendant objected, which objection was by the court overruled, and defendant duly excepted. Objection was again interposed to the question and answer, and was overruled by the court, and the witness then stated the reputation was bad. The witness stated Cordie Brown had been working at this house. Several pages are then taken up by the record with questions, objections, and answers as to Cordie Brown's reputation.

The witness further testified: I had been to defendant's home to one dance; I went there one night and took a young man with me for the purpose of trying to get some whisky. This was objected to by defendant, the objection overruled, and defendant saved an exception. On cross-examination the witness stated they were running two sets, one in each room; I did not see the defendant outside; I suppose he was in the house; I saw his wife and children in the house; the defendant could not have heard the cursing on the outside while he was dancing; I did not see defendant make the girls that were quarreling get out of the house; the fight was outside in the yard; I don't know if defendant told the sheriff he made the girls get out of the house; I don't know who did the cursing on the outside; I heard some cursing, but I don't know where the defendant was at the time; I did not see any lewd, obscene, or indecent acts in the home of the defendant; no sir, I at no time saw any lewd, obscene, or lascivious acts at the defendant's place; the only thing I saw was some girls have a fight in the yard and heard some curse words; J. S. Eder told me defendant's place had a bad reputation; it had had that reputation for at least six months; I don't want to give the names of others who told me about this place; two boys from Duncan told me there was going to be a dance out there that night; I did

not see Roy Bates follow the girls out of the house; after the fight they went into the house and went to dancing.

Robert Lemmons was called on behalf of the state, and testified he was 21 years of age; he was acquainted with Roy Bates and his wife; he lived with them last year and year before last. Witness was then asked by the county attorney:

"Did you ever have sexual intercourse with defendant's wife? A. No, sir, I did not.

"Q. Why did you tell me that? Don't you remember telling Mr. Cook and me that you did have sexual intercourse with defendant's wife? A. I never did tell you that.

"Q. Who did you talk to since you talked to Mr. Cook and I? A. Have not talked to any one since that.

"Q. Did you, I will ask, talk to Pumphandle Bill? A. Pumphandle Bill, no, I don't remember if I did.

"Q. Did you ever stay alone with defendant's wife at the home? Did you ever stay alone with defendant's wife? A. I don't remember if I did or not.

"Q. Do you remember when Cordie Brown was out there? Did you ever see the defendant intimate with Cordie Brown? A. I never did.

"Q. Was you intimate with her? A. No.

"Q. You knew what kind of a girl she was? A. No."

Witness then stated he did not know how long she stayed out there; the witness, in response to the county attorney's question, could not tell how many dances had been given at defendant's home during the time he worked out there; there had been several. Witness was then asked if he ever saw men go there to visit Roy's wife, and an-

swered, "No, sir. I never did, no sir." I was out there and worked at any kind of work the defendant had to do. Witness was then asked:

"Q. You are positive, absolutely positive, that you never told Mr. Cook about your hugging, and kissing, and about your intimate relation—having sexual intercourse with the wife of the defendant, Roy Bates? A. Yes.

"Q. Down to Moffel Drug Store? A. No sir, I did not."

The state then called A. Landis, who testified he knew Roy Bates; he worked at defendant's house that fall during cotton picking; he did not remember who all was there; the defendant and his wife and Robert Lemmons is all I remember; he had seen defendant's wife and Lemmons together quite often; saw them in the field picking cotton, then about the house getting meals together; I have seen them leave together in the car; I did not see any misconduct between them. On cross-examination witness stated Robert Lemmons was working for the defendant; he was picking cotton and helping Roy's wife around the house; there were several people there during cotton picking time; at the time he saw them together he was there working, also his son; never saw anything improper; I would have to say I only saw them together.

Hugh High, called as a witness, testified he went by the home of defendant one evening with defendant's son, and that Mrs. Bates was on the bed with Winford Riddles when they went in the house; the doors were open; I come with my father when I came in to talk with the county attorney about the matter.

Ted Edmonson was called by the state, and testified, in substance:

That he had been to defendant's home to a dance; he was there the night the sheriff came out and disbursed the fight; I did not see any drinking out there that night; I did not smell any whisky; I did not hear any cursing.

"Q. Didn't you tell Mr. Cook a few minutes ago you did? A. _ No, sir.

"Q. Did you hear cursing and obscene language there? A. No, sir.

"Q. Didn't you just talk to Mr. Cook and I? A. No, sir, I never."

I did not know who all was at the dance; I took Cordie Brown to the dance; I did not know what kind of a girl she was; I did not hear anybody cursing out there; I did not see a fight between the girls; I was not in the room; I was in the room where they were dancing; I don't know where the fight begun; I do not know how many rooms there are in the house; I was dancing in the room where I could see through the door and could see they were having some trouble; I had never seen girls fight before; I could not hear what the defendant said to the girls; I got to the dance about 9 o'clock. On cross-examination he stated he never saw anybody around defendant's home do anything lewd, obscene, or indecent. Witness was then asked:

"Q. Everything was orderly and peaceful around defendant's home? A. Yes, sir.

"By the Court: You should make the witness your witness or defendant's witness.

"Mr. Hubbell: Moves the court to strike from the consideration of the jury all the evidence of this witness.

"The court: You may cross-examine witness but should make him your own witness.

"Mr. Hubbell. Then it is the holding of this court that we cannot ask this witness, on cross-examination, whether at any time at the home of this defendant he saw any person carrying on any indecent, lewd or lascivious acts?

"The Court: It is the holding of the court that if you ask the witness that question you will have to make him your own witness, and that opens it up for the county attorney to cross-examine him."

To which ruling of the court defendant excepts, and exceptions are by the court allowed.

The state called Charlie Rece, who stated he had been to defendant's home a few times to dances; I do not remember whether I have been there in the last two or three months; I don't remember who all was at the dance when I was there; I saw Ted Edmonson there; I don't remember seeing Cordie Brown or Thelma Brown; I knew Cordie Brown; I saw the Brooks girls there; that was the night they had the fight; I don't know what the fight came up over; I was outside the house; I saw the fight between the girls; I did not hear what was said; Roy separated them; I don't remember hearing them do any cursing. The county attorney then asked the witness:

"Q. What was it you said to me about the cursing? A. I did not say anything.

"Q. Who have you talked to since then? A. I did not talk to you and Mr. Cook.

"Q. You did not talk to Mr. Cook and me? A. No, sir.

"Q. Did you hear somebody cursing there? A. No, sir, I don't remember it.

"Q. Did you see anybody drunk out there? A. I don't remember if there was. I did not smell any liquor."

Witness then stated he went to the dance with Homer Thomas; I did not ask how the fight came up; I don't know Pumphandle Bill; I know the salesman that works for the Chevrolet car; I don't remember whether he was there or not.

Sam Thompson, called as a witness for the state, in substance stated he had been to defendant's place at a dance; he played the violin; they would have several sets, four couple to the set; I heard a little cursing in the house and the defendant called them down; there was a fight; I don't recall what was said; I did not hear the girls curse; Mr. Bates was standing near the door and told them not to fight; as soon as the disturbance was over the defendant came back and started dancing again; I don't remember whether defendant's wife was dancing, but I suppose she was; I don't know whether Pumphandle Bill was there or not; I did not see him at defendant's house often; I have seen him there on one or two occasions; I do not know whether Pumphandle Bill is married, nor do I know his wife was with him at the dance; I did not see any whisky or any drinking; parties were going in and out of the house; I was playing the violin; I could not say I smelled whisky at the dance.

Jesse Coats testified that he had been to the dance at defendant's house; I only saw a fight one time; I heard some cursing on the outside of the house; I was not dancing; I was looking on.

Jesse Gillam, a witness for the state, in substance stated he had been to defendant's house at different times to dances; I did not see any drinking; I did not see any of the girls smoking cigarettes; I don't know whether they came up to the door drinking or not; I never saw them smoke in the house.

Therman Fletcher testified he knew defendant; he had heard of Cordie Brown; I did not dance any the time I was over there at the dance; I was watching the others; there were no boys doing any cursing in the house; there was a little outside; they were just on the inside of the yard; I did not smell any whisky in the house. On cross-examination he stated he heard them cursing at other parties; he was asked if he knew Pumphandle Bill, and said, yes, sir, I don't think he was there that night.

C. O. Hooper, the sheriff of Cotton county, was called as a witness, and stated he was called out to see about some drunks. He testified in substance the same as S. E. Cook, except he detailed going out to defendant's home previous to the time of this dance; he talked to defendant about his wife driving to town with another man; that he was out there with Mr. Cook the night of the dance; I could hear them cursing in the house; some of the fellows smelled like they had had a drink; one had had a drink too many; the defendant was not drinking; he was pretty sober; the girls came out of the door fighting, and I heard them cursing before they fought; I am acquainted with defendant's home as being a place where persons go for lewd and lascivious acts. The defendant objected, and the court overruled the objection. He was also advised as to the reputation of Cordie Brown, which was bad. Objection was made, and the county attorney asked the question:

"Q. Are you acquainted with Cordie Brown, as being a person of lewd, lascivious character? A. Yes, sir.

"Q. Is that reputation good or bad? A. It is bad."

Witness further stated while the dance was going on defendant was in the house dancing; I don't know whether Roy was dancing with his wife or not. On cross-

examination he was asked several questions as to Cordie Brown's reputation, and witness did not remember who called him to go to defendant's home, or why they wanted him to go; he did not find anybody drunk when he went out there, but Tom's two boys had been drinking, without stating how he got the information; Mrs. Bates and the fellow that was driving with her had a watermelon in the car; they were in a Ford touring car; I did not see anything wrong between Mrs. Bates and the party with whom she was driving; I didn't see any lewd or lascivious conduct; I did not think it was all right for this man to be out with another man's wife; when the girls at the house came out swearing and fell across the car, one was on top the other on the running board; I never made any arrest for that fight; I separated them and left them alone; I never heard any one else swear in the house; the girls were the only ones I heard swearing; I did not stay until the dancers left; they may have stayed until daybreak; we left about 11 or 12 o'clock. In answer to the question:

"Did you see anything lascivious there? A. There was a fight there. I learned of the reputation from one who worked at the courthouse. I did not mean old man Pete's boy, I mean the stone contractor. I mean by the things of this kind and the place he run out there.

"Q. You mean having a dance occasionally? A. Yes, and other things. Lots of people complained about it, and two parties about Duncan told me about the place; and lots of other people."

Mr. Lemmons told me his boy said the place had a bad reputation. His son worked there on shares. Mr. High is another one, he complained. I don't remember, there were several others, they are all I can remember.

The foregoing is the testimony offered by the state.

Mrs. Bates, the wife of defendant, was called and testified they lived on a farm, cultivated three quarter sections; that her husband ran a threshing machine and hay bailer; that she had two children; she was acquainted with Cordie Brown; that Cordie Brown worked for her; she picked some cotton and worked around the place; she came on Sunday and left Tuesday or Wednesday; Dud Harrell came for her; I did not know anything about the reputation of this girl; I had only seen her at the dance; we had a number of cotton pickers working for us at that time; Thelma Brown worked for us a while, helped shock wheat and oats; I knew nothing about her character and did not know her reputation; she had no callers while she was at our house; I remember the occasion of the sheriff, Mr. Hooper, and Mr. Cook being near my house when Fred Man and I drove back from the grocery store where we had gone to get some groceries; we had groceries in the front seat and a watermelon in the back seat; it was not much after dark; we had been gone about three quarters of an hour; I did not see the girls that had the fight at our house at the dance; I was in the kitchen with some other ladies and the children. On cross-examination the witness was asked if she did not know Thelma Brown had been indicted for being drunk, and she said no; she was acquainted with Bill Petty; he had not been coming out to her house every night; he came to dances on one or two different occasions; I did not see his wife; I knew he was married; I don't remember dancing with him.

"Q. Did you have intimate relations with Pumphandle Bill? A. Never did."

I knew W. F. Colston; I think he was married; I don't think he was at our house unless he come to a dance; I have gone with Robert Lemmons on business trips quite

often, but not at night; I was not lying on the bed with Winford Riddles; Ted Edmonson never brought any girls to our house to stay all night; some boys and girls got stuck in the mud and came to our house and stayed all night; the girls slept in the beds and the boys set up. Witness was then asked several questions about the character of parties that came to the dances, and about herself, all of which she answered promptly and clearly, and stated no improper relations existed between her and any of the men, nor had there been to her knowledge any immoral conduct by any of the girls that came to the dances.

The defendant then testified in his own behalf, giving his place of residence, and his age as 29 years; he had been a witness once before in court; he farmed three quarter sections of land, raised cattle, and run a threshing machine and hay bailer; hired considerable help; that he had a dance at his house October 16, 1926; he did not know what time of the day or night Mr. Hooper and Mr. Cook came out there; did not hear the girls swearing in the house; I heard some boys swear some and called them down; after the girls quit fighting I went back and went to dancing; I heard some cursing on the section line about an hour and a half after the fight; the girls got to fighting out by the car, and Cleve and Mr. Cook run in and separated them; Cleve came on in the house and I went on dancing; they called me out and told me I had to stop the cursing, and I told them I stopped it in the house, why don't you make them behave, and he said everything seemed nice enough in the house; Cordie Brown was not at this dance, nor was Thelma Brown; the only misbehaving I saw at the dance was the girls fighting; no lewd, lascivious characters are permitted in my house if I know it; Thelma Brown was at my house the last of May; she wanted to get a job cooking; she shocked some wheat

and oats; I did not know the reputation of Thelma Brown at that time for being a lewd, loose character; no men of lewd or lascivious character come to my house; I had a number of people picking cotton at the time; I remember Mr. Hooper and Mr. Cook coming to my house in the summer; Fred Man was there with the Fletcher boys at the time; he came to collect $4.25 I owed him; when Fred Man came my wife and children were at home; at my suggestion my wife went for some groceries; I was fixing my car and asked Fred to let my wife use his car to make the trip to the store, and he said his car was not running good and he had better drive for her; they were gone just a little while; they got groceries and a watermelon; my wife does my running around while I am at the threshing machine; she picks cotton and takes down the weights of the cotton; I told Mr. Hooper I permitted my wife to attend to my business, and I did not want to be jealous, and the sheriff told me he did not see how I could stand to see her go around with other men and not get jealous; the sheriff wanted to know if there was any whisky at our place, and I did not have any; he said somebody was handling whisky; I did not know anything about the whisky.

On cross-examination witness stated, in answer to the question of the county attorney, that he did not know Thelma Brown at Ryan; I did live at Ryan; I did not go on her bond at Waurika, nor did I know she was in Waurika; I did not know she was in trouble; I did not know there was anything the matter with Cordie Brown; I hired just anybody I could get to help me; I hire women to help my wife, and to do anything they can in the field and pay them for it; I was not intimate with Cordie Brown, and I did not go into her room while she was taking a bath; I did not know the sheriff was after her at

that time; Nellie Smith has not been to my house that I have seen; I had not heard of Nellie Smith being in any trouble; I told all parties when they were at my house to a dance they would have to behave themselves; I left it to the young folks to do the inviting; I did not care how many came just so they behaved themselves; some times I have smelled whisky, but as long as they behaved themselves I did not raise any objections; I did not hear these girls cursing before the fight began; I separated them when they began to fight and told them they would have to respect my house or leave.

The defendant called Harvey Landis and Nesby Sharp, who testified as to having worked at defendant's place. They stated they had not seen any immoral or indecent conduct by any parties around defendant's place; that defendant was working a number of men and that his wife worked along with them in doing the housework and picking cotton.

This is, in substance, the testimony on behalf of the defendant.

The defendant alleges many errors committed by the trial court. His first assignment being that the court erred in overruling the motion of plaintiff in error for a new trial. The fourth, the court erred in overruling defendant's demurrer to the evidence offered on behalf of the state. The sixth assignment is the court erred in overruling defendant's motion for a directed verdict, after all the evidence was in and both the state and defendant had rested.

The defendant in this case is prosecuted under section 1890, Comp. Stat. 1921, which provides:

"Any person who keeps any bawdy-house, house of ill-fame, of assignation, or of prostitution, or any other

house or place for persons to visit for unlawful sexual intercourse, or for any other lewd, obscene or indecent purpose, is guilty of a misdemeanor and upon conviction shall be fined in any sum not less than One Hundred Dollars nor more than Five Hundred Dollars for each offense."

The question to be determined is: Is the testimony in this case sufficient to sustain the charge against the defendant? It is urged by the defendant that the record does not contain a line of evidence tending to support the charge in the information. In order to sustain the offense charged in the information under our statute, it must be established that the house in question was in fact a bawdyhouse, or place for persons to visit for unlawful sexual intercourse, or for any other lewd, obscene, or any other indecent conduct, and that the defendant was the owner thereof.

In Patterson v. State, 9 Okla. Cr. 564, 132 Pac. 693, this court had the statute in question under consideration, and in the first paragraph of the syllabus it says:

"On the trial of a person charged with keeping a bawdyhouse, the issue is, Did such person in fact keep a bawdyhouse? and not, Did he keep a house which had the reputation of a bawdyhouse?"

In Putman v. State, 9 Okla. Cr. 535, 132 Pac. 916, 46 L. R. A. (N. S.) 593, this court, in the first paragraph of the syllabus, said:

"In prosecutions for keeping a house of ill fame, it is competent to introduce evidence of the general reputation of the house in the neighborhood in which it is situated as to its being a place where lewd and lascivious persons of both sexes congregate for the purpose of unlawful cohabitation or sexual intercourse. But such evidence alone will not support a verdict. It must be corroborated by

some other fact or circumstance tending to prove the character of the house."

In this case the sheriff and his deputy testify as to the reputation of the defendant's house, for being a place where lewd characters congregate for the purpose of illicit cohabitation; the sheriff stated the name of a number of parties that told him of the conduct that was supposed to have been indulged in at defendant's home. The state called a number of witnesses, and it must be bound by its own witnesses who testified they had been to defendant's home at different times working for the defendant and that they had never seen any lewd, lascivious, or indecent conduct indulged in at defendant's home. The sheriff and his deputy and the county attorney lay great stress upon the fact that upon a few occasions the wife of the defendant had been seen at a picture show with one of the hands the defendant had employed, and that on another occasion she had driven to a store to get some groceries with Fred Man. The sheriff claims he spoke to the defendant about his wife driving to town with another man, and defendant told him he did not see anything wrong with that; his wife had to run errands for him when he was busy. He tried by the questions propounded to state's witnesses and to the defendant's witnesses to show that some of the women who attended the dances at defendant's home had been seen smoking cigarettes, and that married men attended the dances sometimes not accompanied by their wives. There is no positive testimony in the record showing that the home of defendant was maintained as a bawdyhouse as defined by our statute. All of the witnesses who testified for the state, except the sheriff and his deputy, state they had been to defendant's home to dances, and that they had never seen any improprieties or acts of sexual intercourse or indecent conduct of any of the parties at the home.

The state failed to show by any competent testimony that there was any immoral or indecent conduct indulged in at defendant's home with the knowledge or consent of the defendant, if any was indulged in; the testimony on behalf of the state is only rumor. The sheriff and his deputy place great stress on the fight that two girls got into at defendant's home, that they used some curse words, and they heard another girl use profane words about going home with some man, but the officers, who had heard so much rumor and reputation of the place, remained there and did not arrest these girls for fighting, nor the parties they claim to have heard using curse words. The proof on behalf of the state does show that when the girls got into the disturbance the defendant separated them and told them they would have to leave or behave themselves. The defendant stated he let the young folks invite the people to the dances, and as long as they behaved themselves he did not inquire into the character or reputation of the parties.

We do not believe the action of defendant's wife, in driving to the store in the young man's car for the purpose of getting groceries, is sufficient to sustain the charge.

In Francis v. State, 16 Okla. Cr. 543, 185 Pac. 126, this court in the opinion said:

"The general reputation of the house kept by the defendant is established beyond a reasonable doubt as being a house of ill fame; but there is no evidence tending to show that persons of both sexes who resorted to the house were persons of lewd and lascivious character, or that the inmates of said house were of other than chaste character, or that any immoral acts were committed in said house with the knowledge of the defendant. Hence the evidence is insufficient to sustain a conviction, unless the apparel worn by the girls seen in said house, and the

statements alleged to have been made by the defendant to Wilson and to the sheriff, coupled with the general reputation of the house as a bawdyhouse, make out a case.

"In a prosecution for keeping a bawdyhouse, undenied legal evidence that the house in question has the general reputation of being a bawdyhouse is not sufficient alone to sustain a conviction for keeping a bawdyhouse. Mrs. B. Putman v. State, 9 Okla. Cr. 535, 132 Pac. 916, 46 L. R. A. (N. S.) 593.

" 'The offense defined by the statute is not keeping a house which is reputed to be a "bawdyhouse" but keeping one which is so in fact.' Patterson v. State, 9 Okla. Cr. 564, 132 Pac. 693."

There being no testimony to sustain the allegations, except the testimony of the sheriff and his deputy, as to the reputation of defendant's home, and there being no positive testimony as to the allegations in the information, we hold that the evidence is insufficient to sustain the judgment. The demurrer of the defendant to the evidence of the state was well taken and should have been sustained.

The judgment is reversed.

EDWARDS, P. J., and CHAPPELL, J., concur.